## Atwell Printing & Binding Company, Appellant, v. Prairie Farmer Publishing Company, Appellee.

### Gen. No. 31,435.

1. EVIDENCE—*competency of post office receipts to show mailing date.* Receipts, made in the regular course of post office business, which show among other things the mailing date of magazines, are competent against a printer to show that he mailed the magazines later than his contract with the publisher provided.

2. CONTRACTS—*poor printing as ground for cancelling.* Even though it is not sufficient ground for cancellation of a contract for printing that photostatic copies of some of the work discloses that it was not done in a reasonably good and workmanlike manner, this fact with the evidence on other subjects involved will be considered and given weight in determining whether the printer made out a cause of action against the publisher with whom he had the printing contract.

3. CONTRACTS—*meaning of words "ordinary editions" in printing.* In a contract between a magazine publisher and his printer, the words "ordinary editions" refer not only to a magazine of the same number of pages as the magazine had at the time the contract was made but also the magazine as later expanded to more pages.

Atwell Ptg. & Binding Co. v. Prairie Farmer Pub. Co., 246 Ill. App. 100.

4. CONTRACTS—*binding force of requirement as to printing date of magazine.* A clause in a contract between a magazine publisher and his printer that the printing should not be finally completed until a certain date in order that important late matter might be added, is so far binding that failure of the printer to do so warrants cancellation of the contract by the publisher.

5. CONTRACTS—*competency of papers used after notice of cancellation as bearing thereon.* Original manuscript, dummy pages and page proofs, used by a printer in preparing a magazine for the publisher after the latter had given notice of cancellation of the contract between them, were competent in view of the proofs being typical average proofs and the papers being used by plaintiff within the 60 days allowed after notice of cancellation, under the contract, for continuing work thereunder.

6. CONTRACTS—*default as forbidding recovery for breach.* A printer who fails to provide a magazine publisher with the service contracted for cannot recover for the latter's breach of the contract between them.

7. CONTRACTS—*what default does not destroy right to cancel.* Failure of a magazine publisher to co-operate with his printer as required by their contract, in such matters as reading proof, furnishing proper paper, and his act in changing the magazine to a weekly, constitute so insubstantial a default under the contract as not to destroy the publisher's right to cancel the contract for the printer's failure to furnish the contracted service.

8. CONTRACTS—*effect of partial performance on right to cancel.* The fact that a printer has partly performed his contract for service to a magazine publisher does not prevent the latter from cancelling the contract for failing fully to furnish the contracted service.

9. DAMAGES—*bearing of losing contract on amount of.* A printer cannot obtain damages for a magazine publisher refusing to permit him under their contract to complete magazine issues during the 60 days allowed him after the publisher had cancelled the contract for the printer's failure of service thereunder, in view of the evidence and the printer's own admissions showing the venture was a losing one to the printer.

10. CONTRACTS—*what proof necessary to recover for extra work.* After a magazine publisher has paid for what his contract with his printer expressly calls for, he cannot be made liable for extra service furnished, unless the printer proves either a mutual agreement as to the prices to be paid or the fair and reasonable value of such extra service.

11. EVIDENCE—*materiality of shop books to show balance due.* A printer's shop books, purporting to show charges against a publisher for work done, but not the payments made nor the balance due for

work done in addition to what their contract called for, are not proof that there was anything due on such extra work.

12. APPEAL AND ERROR—*when receiving improper evidence by judge harmless.* Reception of improper evidence will be presumed not to have influenced a judge sitting without a jury, if there is sufficient proper evidence to justify the judgment.

13. CONTRACTS—*breach of binding requirements as ground for cancellation.* A breach by a printer of his contract with a publisher in regard to binding requirements such as observing mailing dates, is in the absence of waiver sufficient ground for the latter's cancelling the contract.

Appeal by plaintiff from the Superior Court of Cook county; the Hon. FRANKLIN H. BOGGS, Judge, presiding. Heard in the third division of this court for the first district at the October term, 1926. Affirmed. Opinion filed October 19, 1927. Rehearing denied November 4, 1927.

WISNER & WALSH, for appellant.

SCHUMACHER & MURPHY, for appellee; THOMAS E. MURPHY, of counsel.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

On February 3, 1920, the Atwell Printing & Binding Company, a corporation, the plaintiff, claiming that the Prairie Farmer Publishing Company, a corporation, the defendant, had broken a 5-year printing contract, brought suit in the superior court for $250,000 damages. There was a trial before the court, without a jury, and, on July 13, 1926, the court found the issues for the defendant, and entered judgment against the plaintiff for costs. This appeal is from that judgment.

The plaintiff, The Atwell Printing & Binding Company, was in the printing business, and located at 732 Sherman Street, Chicago. From 1916 on, it had printed from 75 to 80 different publications. In 1916 it published county directories for the defendant. The defendant, which published a magazine called

Atwell Ptg. & Binding Co. v. Prairie Farmer Pub. Co., 246 Ill. App. 100.

the Prairie Farmer, was located in Chicago, and it was bought by one Butler in 1909. Between the fall of 1916 and November, 1917, negotiations took place between one Atwell, president and manager of the plaintiff, and Butler, president of the defendant, in regard to having the Prairie Farmer, a farm publication, composed, printed and mailed by the plaintiff. At that time the Prairie Farmer was and had been published fortnightly, and it was desired by its owner, the defendant, that it should become a weekly.

On November 15, 1917, after nearly a year of negotiations, the two parties, plaintiff and defendant, entered into a written contract, under seal. It provided for the composition, printing, binding and mailing fortnightly of the Prairie Farmer by the plaintiff for a period of five years, and for the payment by the defendant of certain scheduled prices for the plaintiff's work. Nothing, however, was done under that contract. Gregory, vice president of the defendant, testified that that contract was only a temporary one, made for the purpose of assuring the plaintiff that it could go ahead with the purchase of a rotary press; that Atwell said he wanted the contract for the purpose of showing it to the Hoe people and getting credit on the press.

On December 31, 1918, the contract, which is the basis of this action, and which the plaintiff claims was breached by the defendant, was made. It contains the following material provisions: The defendant contracts with the plaintiff ''for the composition, printing, binding and mailing of the Prairie Farmer every other week or weekly by the party of the second part * * * for a period of five (5) years, beginning with the issue of January, 1919.'' The plaintiff ''agrees to install a special magazine Web press * * * with a capacity of sixty-four (64) pages and * *. * that the defendant shall have the first call on said press * * * for printing its editions * * *'';

that the contract shall begin when the "press is installed and running, and said service on said Web press is to be to the satisfaction of the" defendant. "The closing time of forms of ordinary editions shall be at noon on Monday except two pages which can be held open until Tuesday noon." The plaintiff "agrees to start mailing Wednesday and have the edition all in the mail by noon on Friday. All papers printed before noon of each day will be delivered to the postoffice before six P. M. the same day. On Thursday mailers will work all night if necessary to get papers mailed. An extra delivery to the postoffice will be made by" the plaintiff "on Thursday night, leaving its shop not later than ten P. M."

"It is understood that in making the decreasing rates on volume of circulation, as hereinafter set forth, the Prairie Farmer or the party of the first part, will not demand more than 18 hours per 24 hours press run, and as size of run increases, additional time will be allowed on the above basis by going to press earlier in the week, so that the party of the second part shall not be forced to pay price and a half for overtime to take care of increased circulation. However, it is the spirit of this contract that both parties will work together for the good of the service and said party of the first part agrees to co-operate with the party of the second part in the matter of furnishing copy and O. K.'ing forms to the best advantage of the publication and with as little delay as possible and the party of the second part agrees that it will always handle the circulation with as few hours set back as possible."

In paragraphs 6 and 7, prices for composition, printing, binding, trimming and mailing are set forth.

The plaintiff agrees to mail the magazine for $1.25 a thousand. "The tag system is to be employed and the tags are to be furnished" by the defendant. The plaintiff agrees to furnish necessary storage for defendant's white paper, averaging not more than a

Atwell Ptg. & Binding Co. v. Prairie Farmer Pub. Co., 246 Ill. App. 100.

carload.  The defendant agrees to pay the plaintiff "on the first of each month, for services performed during the previous month."

"It is the essence of this contract that the work shall be done by" the plaintiff "in a thorough and workmanlike manner and to the satisfaction of" the defendant, "and if said work is not done to the satisfaction of" the defendant "it can cancel this contract by giving sixty (60) days notice in writing, of its intention so to do."

The contract was signed, "(Seal) The Prairie Farmer Publishing Company by B. D. Butler, President. (Seal.)  Atwell Printing & Binding Co., by G. M. Atwell, President."

The Web press, provided for in the contract, and which had been ordered by the plaintiff in October, 1917, was received by it, on November 11, 1918, and was installed and ready for use on January 3, 1919. Its cost installed was about $55,000.  Between January 11 and June 28, 1919, the plaintiff did the press work, binding and mailing, but not the composition. Beginning with June 28, 1919, the plaintiff did, also, the composition.

In February, 1919, the plaintiff, owing to an increase in union wages, its shop being on a union basis, asked the defendant for an increase in certain prices for service of 10 per cent.  The defendant acquiesced and paid on the increased scale.  In August, 1919, an increase of 10 per cent for composition was asked by the plaintiff, and on August 27, 1919, the defendant wrote to the plaintiff that it would agree to an increase of 15 per cent over the February figures, barring certain extras.  In that letter the defendant said it would pay for alterations of original copy which it, the defendant made, but not for corrections the result of its instructions not being followed.  In that letter, the defendant further stated that it would like to take up with the plaintiff "the matter of the paper being late,

because this entails a severe loss to us which we believe should call for a penalty on your part.'' Notwithstanding that letter, it was agreed, upon the trial, by counsel for the defendant that after August 22, 1919, bills were rendered by the plaintiff according to a schedule, dated August 22, 1919, which showed various increases in prices.

In October, 1919, the magazine was published weekly, for the first time. Theretofore it had been published fortnightly.

The circulation of the Prairie Farmer on January 11, 1919, was 108,998, of 84 pages each, and gradually increased, until, on October 4, 1919, it was 131,895, of 64 pages each. The first weekly issue was on October 11, 1919, and numbered 134,443 copies of 72 pages each. Between that and December 27, 1919, both inclusive, the weekly issues varied from the figures of October 11 to 142,777 with 48 pages each.

On November 19, 1919, the defendant, through Butler, served a written notice of cancellation of the contract on the plaintiff by delivering to Atwell, personally, a document dated November 13, 1919, which contained the following:

''Paragraph Eleven (11) of the contract entered into between the Prairie Farmer Publishing Company and your Company under date of December 31, 1918, reads as follows:

'It is the essence of this contract that the work shall be done by the party of the second part in a thorough and workmanlike manner and to the satisfaction of said party of the first part, and if said work is not done to the satisfaction of said party of the first part that it can cancel this contract by giving sixty (60) days notice, in writing, of its intention so to do.'

''You are hereby notified that the work of the Atwell Printing and Binding Company has not been done in a thorough and workmanlike manner and to the

satisfaction of the Prairie Farmer Publishing Company, and by reason thereof, the Prairie Farmer Publishing Company elects to cancel this contract within sixty (60) days from this date, and hereby notifies you of its intention so to do.''

The last issue of the Prairie Farmer printed by the plaintiff was that of December 27, 1919. After that, no copy was furnished by the defendant.

The question at the trial was whether on November 19, 1919, when the notice of cancellation was served, the evidence sufficiently showed that the plaintiff had fulfilled its obligations—under the written contract of December 31, 1918—to such an extent that it was not chargeable with a legal breach of the written contract, nor the defendant entitled to cancellation. Among the findings of fact presented by the plaintiff, and which were refused by the trial judge, are the following: That the defendant did not co-operate with the plaintiff so as to aid it in performing those things required of plaintiff for performance of the contract of December 31, 1918; that the size in number of pages of ''ordinary editions'' of the Prairie Farmer at or about the time of making the contract was approximately 36 pages; that performance by plaintiff of its obligations under the contract of December 31, 1918, was such that defendant had no just cause of dissatisfaction; that the contract of December 31, 1918, was not a sealed instrument; that plaintiff substantially performed the contract of December 31, 1918.

The trial judge, also, refused to hold that the defendant by refusing to permit the plaintiff to perform under the contract of December 31, 1918, after publication of issue of December 27, 1919, breached the contract; that the notice dated November 13, 1919, did not constitute a valid termination of the contract of December 31, 1918, so as to relieve the defendant of further obligations thereunder; that work required

of the plaintiff under contract of December 31, 1918, was done in a thorough and workmanlike manner.

In the trial of the case, it became necessary for the trial judge to consider whether the plaintiff, or the defendant, or both, were in default, and in doing so, to determine what the terms of the contract were and, also, what construction the parties themselves by their conduct put upon it. All those matters he resolved, and ultimately found that the "defendant had the legal right to, and did cancel contract of December 31, 1918." The record in the case is voluminous, covering nearly 2,500 typewritten pages, so that it is not practicable to set forth here anything like a complete analysis of all the testimony and exhibits bearing on the question of fact which were passed upon by the trial judge.

For reversal, it is urged by the plaintiff that if it failed, as a matter of fact, to comply with the terms of the contract, it was owing to derelictions upon the part of the defendant. The chief subjects of dispute are the following: That if the plaintiff did not mail the magazines according to contract time, it was owing to the fact that the defendant was changing its mailing system from an old to a modern system and was late in furnishing tags; that the proof was read in page form instead of galley form; and that the poor quality of the paper furnished by the defendant was responsible for the "muddy" appearance of the magazine. It is, also, urged as a matter of procedure that the trial judge erred in ruling upon certain matters of evidence.

As to the subject of mailing. The contract provides as follows:

"The closing time of forms of ordinary editions shall be at noon on Monday except two pages which can be held open until Tuesday noon." The plaintiff "agrees to start mailing Wednesday and have the edition all in the mail by noon on Friday. All papers

printed before noon of each day will be delivered to the postoffice before six P. M. the same day. On Thursday mailers will work all night if necessary to get papers mailed. An extra delivery to the post-office will be made by'' the plaintiff ''on Thursday night, leaving its shop not later than 10 P. M.''

The contract provided, also, as to mailing, that the ''Tag System'' was to be employed, and the tags furnished by the defendant.

The evidence of one Edwards, assistant advertising man for the defendant, is that he knew personally that not all of the issues were in the mail by noon Friday; that he spoke to Atwell about the magazines being mailed late; that he spoke to him about ''probably'' half the issues; that he told Atwell they would not get to the subscribers on time; that on several occasions Atwell said they were late because the folder broke down; that he, the witness, had to do with the mailing, and from his personal knowledge, there was late mailing as to one-half of the issues; that he distinctly remembered they were late by seeing them mailed late; that he remembered being at the plaintiff's plant and seeing the magazine mailed on Friday, Friday afternoon, and on Saturday.

The evidence of one Naden, who had charge of mailing for the defendant, is that the regular mailing lists were sent to the plaintiff in rolls; that the first 40 per cent were sent over to the plaintiff on Tuesday, about 40 per cent on Wednesday, and the balance before Thursday noon; that that percentage might vary a few per cent; that the lists of new subscribers that were received on Wednesday and Thursday, and which were about 430, were sent over on Friday morning; that the names of new subscribers received before were sent in the regular mailing lists; that in 1919, he was at plaintiff's plant, two or three times an issue, to check up on the running of the edition and the process of mailing; that he saw the plaintiff during mail-

Atwell Ptg. & Binding Co. v. Prairie Farmer Pub. Co., 246 Ill. App. 100.

ing of the regular edition on Saturday afternoon and talked to Pletcher, plaintiff's superintendent, about it, and asked him why they were late, and Pletcher said he thought they had been mailed; that he saw magazines being bound, stretched and trimmed on Saturday afternoon; that the defendant used the Belknap system of mailing up to July 1, and then began to introduce the Pollard-Allen system; that the circulation in January, 1919, was about 100,000, and on December 27 was about 150,000; that the plaintiff was at work stretching and binding on regular editions on Friday afternoon on about 40 per cent of all the issues.

On August 27, 1919, in a letter by the defendant to the plaintiff, which was an answer to one of the plaintiff, the defendant, after stating that it would agree to an increase of 15 per cent over certain February prices, the following occurs: ''We would like also to take up with you at as early a date as possible the matter of the paper being late because this entails a severe loss to us which we believe should call for a penalty on your part.'' A number of witnesses for the plaintiff testified on the subject of mailing. Some of their evidence is in conflict with that of Edwards and Nader; and some of it to the effect that mailing was delayed for want of tags, which, of course, is an obvious admission that there, at least, was delay.

In addition to the testimony referred to, there was offered in evidence by the defendant certain post-office documents signed by the postmaster, entitled Exhibits H-1 to H-197. They were in the nature of receipts for postage, and contained the name of ''Prairie Farmer,'' date of issue, weekly or otherwise, per cent of advertising, date of mailing, zone, poundage, rate of postage, and amount of postage. They showed that in the case of many copies of many issues the delivery for mailing was late. It is contended, however, for the plaintiff that the receipts were not competent to

Atwell Ptg. & Binding Co. v. Prairie Farmer Pub. Co., 246 Ill. App. 100.

show the date and hour of mailing. We are of the opinion that they were competent. They were documents made out under the postmaster's supervision, that is, in the course of the regular work of the office. The process at the post office, from the receipt and weighing of the magazines to the final issue of the receipt, was quite elaborate, but the date of delivery by the plaintiff to the post office was an essential fact, and, apparently, regularly recorded on each receipt. A receipt without a date would be, from a business standpoint, an incomplete record. Of course, after they were introduced, the plaintiff would have the privilege of undertaking to show that they were untrue.

None of the cases cited for the defendant involved facts similar to those here considered, and so are not in point. On this subject, generally, however, we are of the opinion that the evidence, even without the receipts, was such that we are not justified in overriding the finding of the learned trial judge who, of course, saw the witnesses and heard the testimony. There was ample evidence tending to show that mailing of many copies of many issues was unreasonably late, and was not caused by the defendant.

It is contended for the plaintiff that the inferior appearance of some of the magazines, which, according to evidence for the defendant, had a muddy appearance and showed certain longitudinal lines, was owing to the poor quality of the paper furnished by the defendant. It is the evidence of Edwards that about 50 per cent of one issue called the Farm Power issue, which was put out in February, had muddy and smeared covers; that twice he talked with Pletcher about it; that it was corrected temporarily but later "run" the same as at first. The evidence of Gregory is that on quite a number of the issues in 1919 the inking was not good, that some was light and some heavy; that quite a number of issues showed longitudinal hair

lines on a number of pages; that he suggested a remedy to Atwell but the latter said it would slow up the press and would not help the condition; that he asked Atwell to use a "smut roll," but he objected that it would slow up the press. On the other hand, there is testimony by one O'Hagen that the paper furnished by the defendant was brittle, and that the longitudinal lines were a defect in the paper. Photostatic copies of pages of certain issues were introduced in evidence by the defendant, and it is quite obvious to one not an expert that some of the printing was not done in a reasonably good and workmanlike way. In our judgment, we would not be justified in holding that such work was in full compliance with the contract. It is true that if this were the only ground for cancellation, we should be inclined to hold that it was insufficient; however, it is, nevertheless, something to be considered and given weight in conjunction with the evidence on other subjects involved in determination of the question whether the plaintiff made out a cause of action.

It is contended for the plaintiff that the words, "ordinary editions," in paragraph numbered four in the contract, which is, in part, as follows, "The closing time of forms of ordinary editions shall be at noon on Monday except two pages which can be held open until Tuesday noon," had reference to editions approximately similar in size and number of copies to certain figures mentioned by Atwell in a letter of December 13, 1916, to Butler. The trial judge refused to so hold, and we think properly. There is nothing whatever in the contract, and no evidence outside of it, that tends in any substantial way to establish the plaintiff's contention; in fact, if early negotiations are to be considered, the phrase "ordinary editions," meant regular editions even of increased size. That was what the new press in part was put in for.

As to the words, "The closing time of forms of

Atwell Ptg. & Binding Co. v. Prairie Farmer Pub. Co., 246 Ill. App. 100.

ordinary editions shall be at noon on Monday except two pages which can be held open until Tuesday noon.'' The purpose of holding open two pages until Tuesday noon was to give the defendant an opportunity to put in late news and market reports.  The evidence of Gregory is that he told Atwell the defendant's weekly competitors were able to get in late news and market reports, and that the defendant wanted to put in similar late news and market reports; that it was essential to get the magazines in the mail before noon on Friday so as to reach the rural carriers by Saturday morning; that if the magazines arrived on Saturday, they would be delivered Monday or Tuesday, and advertisements would be decreased accordingly.  One Howard, a foreman for the plaintiff, testified that pages were not held open to Tuesday noon to receive late news.  Apparently, this is not denied.

In September, 1919, Atwell wrote a long letter to Butler, which is in reality a statement of the difficulties the plaintiff was laboring under in trying to fulfil the terms of the contract, and an appeal to the defendant, in reality, to forego some of the contract's requirements.  That letter, practically demonstrates that the plaintiff was not able to go on and comply with the contract and must have indulgence; that the plaintiff had contracted to do more than, in fact, it could accomplish.  It contains some criticism of the conduct and requirements of the defendant, but in its essence, it is a plea for concessions from what the contract actually prescribes.  The letter contains this, ''We cannot be expected to do the impossible, mechanical things and all kinds of overtime for service.  One of the features we took up at one time, was holding a page till Tuesday.  This cannot be done, with hand-binding and be in the mail as early as you wish Friday. '* * * There are limits to mechanical impossibilities, and to cost possibilities at a given price.''  There is considerable evidence on this subject.  And in our judgment,

bearing in mind the words of the contract, which undoubtedly were binding, the evidence shows a failure to comply therewith.

It is contended that the court erred in admitting in evidence certain "K" exhibits offered by the defendant. Those exhibits consisted of original manuscript, dummy pages, and certain page proofs of the issues of December 20 and 27, 1919. It is argued that as the notice of cancellation was served on November 19, 1919, what was done by the plaintiff thereafter was incompetent. Inasmuch, however, as they came from the possession of the plaintiff, and Gregory testified that they were typical average proofs as far as corrections were concerned, and were used or produced within the 60 days' time given the plaintiff under the notice, we think they were competent. Moreover, even if incompetent, we think the evidence in the case was such that we would not be justified in overriding the ultimate finding of the trial judge.

It is contended for the plaintiff that as the contract contained the words, "However, it is the spirit of this contract that both parties will work together for the good of the service, and said party of the first part (the defendant) agrees to co-operate with the party of the second part in the matter of furnishing copy and O. K.'ing forms to the best advantage of the publication and with as little delay as possible, and the second party agrees that it will always handle the circulation with as few hours setback as possible," and as the evidence shows that according to the claim of the plaintiff it was the failure of the defendant reasonably to co-operate in the work of getting out the magazine, there was no breach by the plaintiff; that the evidence shows a fatal failure of co-operation by the defendant on a number of matters, such as incompleteness of dummy pages; missing display "ads"; failure to read galley proof; mailing; change to weekly; closing date; no pages indicated; furnishing copy; alterations and corrections; quality of paper fur-

Atwell Ptg. & Binding Co. v. Prairie Farmer Pub. Co., 246 Ill. App. 100.

nished, and payments for work. There may be some evidence of difficulties from time to time between the parties, and some evidence of a mutual failure of reasonable co-operation, still, as the plaintiff was in default as to material parts of the contract, as we have stated above, the law does not permit it in such a situation to recover for the defendant's derelictions. One cannot recover for a breach of contract while in default himself. *Purcell Co. v. Sage,* 200 Ill. 342. But it is argued that the defendant had no right to cancel the contract if it was at the time in default. We do not find, however, that the conduct of the defendant was such as to destroy its right to cancellation; what it failed to do, bearing in mind the express terms of the written contract, was too insubstantial. There is argument for the plaintiff that the purchase and installation of the new press constituted and implied in some way a consideration given to the defendant. The contract, however, provided that "The terms of this contract shall commence when said Web press is installed and running." Atwell testified that the press arrived November 11, 1918, and was ready on January 3, 1919. The contract was made December 31, 1918. It is true that when the press was in and running that the plaintiff had executed the contract to that extent. But the defendant is now making no claim to the press. At all times it has been the sole property of the plaintiff. The contract was in many ways executed, in part, from the time it was made until cancellation, but it does not follow that execution in part by the plaintiff prevented cancellation. It was chiefly a contract for service, and as service was rendered by the plaintiff and paid for by the defendant, the contract to that extent was fulfilled. That the contract provided as a prerequisite to service the putting in and use of the new press did not give the plaintiff any other rights than those expressly provided for in the contract, which were for service alone. Some contention is made for the plaintiff that

the terms of the contract as to prices to be paid by the defendant were changed by subsequent agreement of the parties. We have examined the evidence on that subject, and agree with the trial judge in his refusal to hold that the contract sued upon was not legally modified on August 22, 1919, so as to bind the defendant thereafter.

It is contended for the plaintiff that the defendant was liable, in any event for profits during the 60-day period; that is to do the work until January 3, 10 and 17, 1920, and, as a consequence of the defendant's failure to permit the plaintiff to do the work on those editions, it was entitled to damages.

The evidence, however, in our judgment, does not sufficiently prove that the plaintiff suffered any pecuniary loss as the result of being prevented from working on those three issues. The evidence on the subject of alleged profit and loss is somewhat voluminous, but after carefully examining it, and particularly in conjunction with the written statements of Atwell sent to the defendant, in the course of the year 1919, which intimate very strongly that the contract, if carried on pursuant to its terms, was a losing one to the plaintiff, the conclusion is inevitable that it fails to show enough to justify an affirmative finding of damages for the plaintiff for the loss of service on the three issues mentioned.

Under the fourth count of the declaration, the plaintiff claims $4,454.84 for extra work and labor performed in the year 1919 on various issues of the Prairie Farmer, and for which, it is alleged, the defendant has refused to pay. The extra charges, according to plaintiff's claim, are for composition costs due to defendant's delay in furnishing copy; additional alterations due to defendant's negligence in correcting proof; utilization of half-rolls, when full rolls should have been furnished; handling and storage of excess amounts of unused paper and handling of poor quality paper; and extra press work and overtime due to de-

fendant's delay in O. K.'ing form and making corrections. It will be seen, by considering the written contract between the parties, that all these items are for matters which it is claimed by the plaintiff grew up as the result of some mutual modification of the contract; or as the result of a failure of co-operation by the defendant. As the evidence stands in the record, we are of the opinion that the plaintiff failed to prove it was entitled to this claim. The defendant paid for what the contract expressly charged it with; and so if the plaintiff furnished anything outside of what the contract expressly covered, it was necessary for the plaintiff to prove either some mutual agreement as to the prices to be paid, or to show by evidence the fair and reasonable value of the services rendered. No such proof was made. *Kirk v. Wolf Mfg. Co.*, 118 Ill. 567; *People's Casualty Claim Adjustment Co. v. Darrow*, 172 Ill. 62. It is true that there was a stipulation that the items mentioned in the fourth count, with certain exceptions, were work done by the plaintiff, but not at the defendant's request; and that there were certain charges made for the work, and certain payments made thereon which the defendant considered as payment in full; and that it was a question of evidence, whether or not there was anything further due. But as far as we can find, it is impossible to conclude that the record shows sufficient to justify the allowance of the claim as made. The plaintiff offered in evidence certain entries from its shop books which purport to show charges made by the plaintiff in the course of 1919 for the entire work done under the contract, but they do not show the payments that were made nor any balance due for work referred to in count 4.

Various other contentions are made in regard to the rulings of the trial judge on matters of evidence, but as the court said in *Kreiling v. Nortrup*, 215 Ill. 195:

"The case was heard by the court without a jury, and as to the evidence admitted to which objection

is made, the rule is, that no improper or immaterial evidence will be presumed to have influenced the court in reaching a decision where there is sufficient proper evidence to justify the judgment." *Pratt v. Davis,* 224 Ill. 300; *People for use of American Automobile Ins. Co. v. Egan,* 241 Ill. App. 189.

It seems from the evidence that the plaintiff sincerely endeavored to carry out its obligations, but, for various reasons, not caused by the defendant, was unable to perform according to the requirements of the contract, and although the parties were to co-operate, and in many ways did, still, there were more or less hard and fast requirements, such as the important one in regard to mailing, that were quite rigorously binding, and which were not waived, and were, therefore, if not lived up to, a sufficient ground for cancellation. It may seem hard to hold that the plaintiff failed, and that the defendant was within its legal rights, when it cancelled the contract, but in business matters when the parties have seen fit to prescribe their relations in writing, the court is bound by the law to apply to their conduct the rules which they themselves have formulated.

For the reasons set forth above, the judgment will be affirmed.

*Affirmed.*

HOLDOM and WILSON, JJ., concur.