.(No. 28194.—

ABINGDON BANK & TRUST COMPANY, Appellant, *vs.* H. C.
BULKELEY *et al.*, Appellees.

*Opinion filed May 23, 1945—Rehearing denied September 13, 1945.*

BURRELL BARASH, of Galesburg, for appellant.

KENWORTHY, HARPER, SOLLO & GRAHAM, (R. G. GRAHAM, of counsel,) both of Moline, for appellees.

Mr. JUSTICE SMITH delivered the opinion of the court:

This is an appeal from a judgment of the Appellate Court for the Second District on leave granted by this court. The suit was brought by Abingdon Bank & Trust Company (hereinafter referred to as appellant,) as plaintiff in the circuit court of Knox county. The defendants named in the suit were appellees, H. C. Bulkeley and C. D. Byram (hereinafter referred to as appellees,) together with four other former directors of the First National Bank of Abingdon. All of the defendants who were served with process, except appellees, defaulted. It was alleged in the complaint that the other three former directors of the First National Bank of Abingdon, who were parties to the notes involved, died prior to the time the suit was instituted.

The suit is based on nine promissory notes, which are the second renewals of a like number of notes executed severally by the nine directors of the First National Bank of Abingdon, on August 29, 1927. Each note was signed by one director as maker, and endorsed by the other eight directors. The notes aggregated $56,156. They were payable to the First State and Savings Bank of Abingdon.

Appellant holds the notes as assignee of the payee therein named. They were assigned to it subsequent to the maturity dates thereof and are subject to all defenses available against the original payee.

Appellees filed their answer in which they set up several separate defenses to the cause of action alleged in the complaint. They rely first on the second defense, which was that the contract in connection with which the notes sued on were given was *ultra vires* the State Bank and, therefore, the notes were void. This defense cannot be sustained under our holding in *Groves* v. *Farmers State Bank,* 368 Ill. 35. The other defense relied upon is that the notes which constitute the basis for the cause of action sued on have been paid.

The record shows that on August 27, 1927, the First National Bank of Abingdon (hereinafter referred to as the National Bank,) was in failing circumstances. On that date negotiations were begun between the National Bank and the First State & Savings Bank of Abingdon (hereinafter referred to as the State Bank,) for the voluntary liquidation of the National Bank. These negotiations continued with some interruptions until after midnight on Sunday night, August 28, 1927. At that time a contract was entered into between the two banks, which was executed by the officers of the banks. This contract was dated August 29, 1927. The record further shows that during the negotiations leading to the execution of the contract, the directors of the National Bank, including appellees, were in and out of the room at intervals where the negotiations were being carried on. There is no proof, however, that appellees participated in the actual negotiations or in the preparation of the contract. They testified that they did not. At the time the contract was executed by the officers of the two banks, appellees and the other directors of the National Bank were called in. The contract was there read to them. While the contract referred to

certain exhibits as being attached to and made a part of the contract, the undisputed evidence is that such exhibits were not attached to the contract, nor were the exhibits read to or examined by appellees or the other directors of the National Bank. The original contract was offered in evidence on the trial of this case. It did not, at that time, have the exhibits referred to attached to it.

The controversy in this case involves two provisions of the contract. The first provision in the contract, which is here material to be considered, is that relating to the cash and cash balances due from banks which, at the time the contract was executed, belonged to the National Bank. That provision of the contract is as follows:

"PARTY OF THE SECOND PART hereby sells, assigns, conveys and sets over to the PARTY OF THE FIRST PART the following assets of THE PARTY OF THE SECOND PART to wit:

"CASH and CASH BALANCES DUE FROM BANKS in the total amount of *Sixty-seven thousand Nine Hundred Ninety Two and 61/100* Dollars as evidenced by EXHIBIT "A" which is hereto attached and made a part of this contract."

The other provision of the contract here involved is the paragraph relating to the directors' guarantee fund, which is as follows:

"DIRECTORS GUARANTEE FUND in the total amount of *Fifty-six Thousand One Hundred Fifty Six and no/100* Dollars as evidenced by EXHIBIT "H" which is hereto attached and made a part of this contract; and it is hereby agreed by the Parties hereto that the Party of the Second Part will place with the Party of the First Part as collateral security to the notes listed in "EXHIBIT H" the corporate note of the Party of the Second Part in the principal sum of Seventy Five Thousand and No/100 Dollars said note to be executed and delivered with this Agreement; and as further collateral security to the notes listed in EXHIBIT "H" Party of the Second Part hereby pledges the equities represented by the shares of stock of the Bank of St. Augustine as listed in EXHIBIT "I" which is hereto attached and made a part of this contract; and it is further agreed by the Parties hereto that after the notes plus accrued interest listed

in EXHIBIT "H" have been liquidated from the proceeds of the corporate note of Seventy Five Thousand Dollars hereinabove mentioned together with the proceeds from the bank stock listed in EXHIBIT "I" that any remaining surplus shall be transferred into the 'General Guarantee Fund' hereinafter mentioned and applied as hereinafter provided."

The notes listed in Exhibit "H" are the original notes, the renewals of which are the subject matter of this suit.

Upon a trial before the court, judgment was entered in favor of appellant and against appellees for the balance due on the renewal notes, which are the subject of the suit. This judgment was reversed by the Appellate Court, (312 Ill. App. 177,) without remanding. Later, upon motion of appellant, supported by affidavits, the judgment of the Appellate Court was modified and the cause remanded for a new trial. A second trial was had in the circuit court without a jury. Judgment was entered in favor of appellees and against appellant for costs. This judgment was affirmed by the Appellate Court. (323 Ill. App. 70.) The issues are such that a somewhat detailed statement of the facts is necessary to an understanding of the questions involved.

The record shows that at the time the contract between the two banks was executed, the nine directors of the National Bank were the owners of stock in that bank of the aggregate par value of $36,850. At the time the contract was signed, or shortly thereafter, these directors delivered to the State Bank their personal checks and cash, aggregating $36,850. Each director contributed to the aggregate amount paid an amount equal to $100 for each share of stock owned by him. It is these payments by the directors to the State Bank which are the subject of the controversy in this suit. This item of $36,850 was, in fact, included in the item of $67,992.61, of cash and cash balances due from banks, mentioned in the provision of the contract first above quoted. The record further shows that at the time the contract was executed, the National

Bank executed and delivered its corporate note to the State Bank in the sum of $75,000, the amount of that note being the full superadded potential liability of all of the stockholders of the National Bank, including the nine directors.

The decisive question here is whether the $36,850, paid by the directors of the National Bank to the State Bank, is to be treated as payment by them of their anticipated superadded stockholders' liability, or whether such payments are to be treated as a part of the assets transferred by the National Bank to the State Bank. If such payments are treated as payment by the directors of the National Bank of their superadded stockholders' liability, then, under the directors' guarantee provision of the contract, such payments should have been credited on the judgment entered on the $75,000 note executed by the National Bank and payable to the State Bank. If so credited, then, under the terms of the directors' guarantee provision of the contract, such payments should, in turn, have been credited on the notes aggregating $56,156, executed by the directors of the National Bank and which constitute the subject matter of this suit. It is conceded that if the $36,850 paid by the directors is credited on their notes, such notes have been paid in full.

It is the contention of appellant that in the negotiations between the two banks, preceding the execution of the contract, it was first determined that the total agreed value of the assets of the National Bank, which were to be transferred to the State Bank, was $542,981.71; that the total liabilities of the National Bank, which were to be assumed by the State Bank, were $643,487.71, leaving a deficiency of $100,506 between the agreed value of the assets and the amount of the liabilities. It is further contended by appellant that, in order to make up a part of this deficiency, the directors of the National Bank paid to the State Bank, in cash or checks, the sum of $36,850,

which, it is contended, became and constituted a part of the cash assets of the National Bank which were sold and transferred to the State Bank; that this increased the agreed value of the assets of the National Bank to $579,831.71, thereby reducing the deficiency to $63,656. It is further contended that, in order to wipe out the remaining deficiency between the assets and liabilities, the directors executed their notes in the aggregate amount of $63,656, which was the amount of the deficiency; that before the contract was actually executed, the value at which the State Bank was to take over the building, furniture and fixtures of the National Bank was increased from $25,000 to $32,500; that thereupon the directors' notes which had already been executed were credited *pro rata* with the aggregate sum of $7500, being the increase in the value of the building, furniture and fixtures agreed upon; that by this method, and as the result of the negotiations, the value of the assets of the National Bank transferred to the State Bank was increased to the amount of the liabilities assumed. Upon this premise it is argued that the $36,850, paid by the directors of the National Bank to the State Bank at the time or subsequent to the execution of the contract, should be treated as a part of the assets of the National Bank transferred to the State Bank and not as the payment by said directors of their anticipated superadded stockholders' liability. It is further contended that the contract is ambiguous and that the negotiations between the two banks, leading up to its execution, should be considered in construing it.

There is no doubt on this record but that the negotiations between the two banks leading up to the execution of the contract, disregarding other facts shown by the record, sustain this contention of appellant as to what the parties to the contract really had in mind during the negotiations. If this was a suit on the contract between the two banks involving only the question of what the parties

intended by their contract to include in the assets transferred, the argument would be fairly sustained by a consideration of their negotiations prior to the execution of the contract. But this is not a suit between the two banks on the contract. The only ambiguity in the contract arises from the inclusion in the item of $67,992.61, of cash and cash balances, in Exhibit "A" referred to in the contract, of the item of $36,850, paid by the directors to the State Bank. Appellees both testified that Exhibit "A" referred to in the contract was neither read nor shown to them; that they had no knowledge of what items entered into and made up the item of $67,992.61, of cash and cash items referred to in the contract; that they were not told by anyone that the $36,850, to be paid by the directors of the National Bank, was to be considered as assets of the National Bank transferred to the State Bank, nor that said item was included in Exhibit "A," referred to in the contract. In this respect their testimony stands unchallenged.

It must be kept in mind that appellees were not parties to the contract. The only provisions of the contract affecting their rights and relating to the notes on which this suit is based are those dealing with the "Directors' Guarantee Fund." Those provisions are clear and unambiguous. That part of the contract, therefore, must be construed in accordance with the language used by the parties to express their agreement. The contract, as written, cannot be reformed in this suit. This is a case between third parties who are not parties to the contract. Hence, the contract must be enforced as written. Whatever may have been the intention of the parties to the contract, as evidenced by the negotiations preceding its execution, we can consider only the intention of the parties as expressed by the language used by them in reducing their agreement to writing. It may well be that the State Bank, or even both banks, in their negotiations leading up to the contract, considered the $36,850, to be paid by the directors

of the National Bank to the State Bank, as a part of the assets of the National Bank, which that bank transferred to the State Bank. But this is not the agreement which was expressed in the "Directors' Guarantee Fund" provision contained in the contract. This is the only provision in the contract relating to the directors' notes. By that provision in the contract the notes of the directors aggregating $56,156, are identified as the notes listed in Exhibit "H." It is there clearly stated that the National Bank had given its corporate note to the State Bank for $75,000. This was the total amount of the superadded potential liability of all of the stockholders of the National Bank, including the directors. It is further clearly stated that the said $75,000 note was given as collateral security for the directors' notes. It is further recited in that provision that, as additional and further collateral to the notes of the directors, the National Bank had pledged the equities represented by the shares of stock of the Bank of St. Augustine, which was owned by the National Bank. It was further expressly and clearly provided "that after the notes, plus accrued interest, listed in Exhibit "H" [the directors' notes] have been liquidated from the proceeds of the corporate note of $75,000, hereinabove mentioned," together with the proceeds from the stock of the St. Augustine Bank, any remaining surplus shall be transferred to the general guarantee fund thereafter mentioned in the contract. The general guarantee fund referred to is the subject of the next succeeding paragraph of the contract. It is to be used by the State Bank to reimburse it for any losses sustained from the liquidation of the assets of the National Bank for less than the liabilities assumed under the contract.

The amount of the corporate note, as already observed, was equal to the amount of the superadded liability of all the stockholders of the National Bank. The clear and unambiguous language of that paragraph of the contract

above referred to is that the corporate note was given. to the State Bank as collateral for the payment of the directors' notes, renewals of which are here involved. The contract clearly contemplates that the funds arising from the collection of the superadded liability of all the stockholders shall be applied to the payment of the corporate note which was pledged as collateral for the payment of the directors' notes. The corporate note could only be paid from collections of stockholders' liabilities and the stock of the bank of St. Augustine. The National Bank had no other assets or sources from which such note could be paid. It is thus clearly demonstrated that the only part of the contract between the two banks relating to the directors' notes is expressed in clear and unambiguous terms. In view of this, any ambiguity in the contract or misunderstanding between the parties to it, relative to what was, or was not, regarded by them as included in the assets transferred by the National Bank to the State Bank, is wholly immaterial. Such ambiguity or misunderstanding has no bearing whatever on the manner in which the directors' notes were to be paid, which is specifically provided for in the subsequent clear and unambiguous language of the contract relating to the payment of said notes.

While it is the general rule that, in construing a contract, it is proper for the court to take into consideration the surrounding circumstances, this does not give a court the right by construction to establish a different contract from that expressed in the written agreement. The object of construction is to ascertain the intention which the parties have expressed in the language of the contract, and where there is no ambiguity in the terms used, the instrument itself is the only criterion of the intention of the parties. *Green* v. *Ashland State Bank*, 346 Ill. 174.

Courts may not, because a more equitable result might be reached thereby, construe into a contract provisions which are not there. The circumstances which courts may

consider in determining the construction of a contract are those arising in the contract itself. Before a court may look at the surrounding circumstances there must be ambiguity in the language of the instrument. Where there is no ambiguity in the language of the contract, the meaning must be determined from the words used and from no other source. *Englestein* v. *Mintz,* 345 Ill. 48.

The intentions of the parties can be known only from the writing to which the contract is reduced, and no assumption which is contrary to the language used can be based upon a consideration of the circumstances surrounding the parties when the contract was made. (*Martin Emerich Outfitting Co.* v. *Siegel, Cooper & Co.* 237 Ill. 610.) In order to adopt the construction contended for by appellant, we would be required to interpolate into the "Directors' Guarantee Fund" paragraph of the contract the limitation that the corporate note was to be liquidated solely from funds collected from stockholders of the National Bank, other than the directors. This we cannot do. No such limitation was imposed by the language used by the parties to the contract to express their agreement.

As already observed, the contract cannot be reformed in this suit between parties neither of whom is a party to the contract. The contract must be enforced as written, and in accordance with the intentions of the parties therein expressed.

But, if it could be assumed that the contract was ambiguous as to the application of the $36,850, paid by the directors of the National Bank to the State Bank at the time or shortly after the contract was executed, the record shows that the parties to the contract placed a practical construction upon it long before this litigation arose.

In this practical construction of the contract, the president of the State Bank placed an interpretation upon the contract contrary to that now contended for by appellant. On November 5, 1927, according to arrangements between

the two banks at the time the contract was made, the State Bank placed the $75,000 note of the National Bank in judgment. On December 17, 1927, a receiver for the insolvent National Bank was appointed by the Comptroller, to enforce the collection of the superadded liability of the stockholders. The State Bank, having assumed all liabilities of the National Bank due to other creditors, by virtue of the $75,000 corporate note was then the sole creditor of the National Bank.

On December 24, 1927, the receiver addressed a letter to the office of the Comptroller. In that letter, the receiver stated:

"The assessment against the shareholders of the First National Bank of Abingdon, which I am to collect, is secured by note of Directors of First National Bank of Abingdon to the First State and Savings Bank, Abingdon, Illinois. The amount of deficiency is $56,500, the directors having paid their stock assessment. In all probability the amount of this assessment against the stockholders will have to be raised in Abingdon. In other words the First State and Savings Bank will probably be called upon to furnish this money for a number of these stockholders, and in event of the money being sent out of the county to Chicago it will work more or less of a hardship on that community. The First State and Savings Bank is the only judgment creditor of the First National Bank of Abingdon and if there is any method whatever by which this money could be left in the First State and Savings Bank it would help the local financial situation in Abingdon considerably."

To this letter, the Comptroller's office relied on January 11, 1928, as follows:

"Reference is had to that portion of your letter of December 24, which states that the amount of the deficiency of the First National Bank of Abindgon in its assets sold to the First State and Savings Bank, amounts to $56,500. In explanation of this statement, you state that the directors have paid their stock assessment. This statement is not understood for the reason that the assessment against the shareholders was not issued by the Comptroller until January 4, 1928, and this assessment will not be due until February 11, 1928. The judgment obtained by the creditor bank amounts to $76,683.37, and the assessment against the shareholders is in the total sum of $75,000."

On February 14, 1928, the Comptroller's office again wrote the receiver, in which the receiver was advised:

"In order that the directors may receive proper credit on the books of the receivership and this office for the payment of their assessment, some arrangement must be made with the creditor bank to release to you as receiver the money so paid it. Being the only creditor, we will immediately turn over to it the cash released in the form of a dividend. To accomplish this, it will be necessary for the funds to be remitted to the Drovers National Bank of Chicago, and this office advised. You will then recommend the payment to the creditor of a dividend equal to the funds represented by the directors' stock assessment liability. Please take this matter up with the officers of the First State and Savings Bank and explain to them that this procedure is the only manner in which the assessment of the directors can be shown as paid on your records, and attempt to have this arrangement promptly completed."

On October 16, 1928, the president of the State Bank addressed a letter to the Comptroller's office in which he stated:

"I am in receipt of a letter from Mr. Guy B. Hardy, Receiver of the First National Bank of Abingdon, Ill., in *relation to stock assessments aggregating* $36850.80 paid direct to us by the directors of the First National Bank as their assessment at the time of the merger of the two banks. * * * As a compromise however I am going to suggest that we make an exchange of checks or drafts at a place that you may designate either in Galesburg or Chicago in this way we will not be out any money and your records will be complete."

On November 6, 1928, the Comptroller's office, in reply to the letter of the president of the State Bank of October 16, 1928, stated:

"We are in receipt of your letter of October 16th relative to the $36,850 which was paid direct to you by certain shareholders of the First National Bank of Abingdon at the time of the merger of the First National Bank with your bank. This amount represents the assessment which these several people anticipated would be levied against them as shareholders of the First National Bank. Inasmuch as an assessment had not been levied, the payment direct to your bank at that time cannot be considered as a payment of the assessment levied by the Comptroller of the Currency at a later date, unless such funds pass thru this office. * * * Your suggestion has been given careful consideration and we have today

written Receiver Hardy relative to the matter and have furnished him with a blank dividend check with the request that he prepare same payable to your order, obtain the indorsement of your bank thereon and return such check to this office, after which we will make the necessary entries on our books to clear up the transaction and forward such check to the drawee bank in order to obtain cancellation of same."

On the same date, the Comptroller's office sent a letter to the receiver which, after referring to the letter of the president of the State Bank of October 16, 1928, suggested that the matter be handled with the State Bank by an exchange of checks, giving specific instructions to the receiver as to the method in which the transaction should be handled. In this letter the receiver was instructed to prepare a dividend check, payable to the State Bank in the sum of $36,850. The receiver was further instructed to have the State Bank indorse the check and sign a dividend receipt in like amount; to then forward the unsigned dividend check to the Comptroller for his signature, together with the dividend receipt. As requested, the State Bank endorsed the unsigned dividend check for $36,850, and also signed the receipt acknowledging payment, by the receiver, of a dividend of $36,850, on account of funds collected from the stockholders. The endorsed but unsigned dividend check, and the dividend receipt were, by the receiver, forwarded to the Comptroller's office. That office then signed the dividend check and forwarded it to the depositary bank in Chicago, together with its own check in the same amount, payable to the depositary bank, and requested that bank to enter the charge and credit on account of these checks simultaneously.

It will thus be seen that the transaction was handled as a mere book transaction in which no money actually changed hands. As the result of this transaction, at the request and upon the insistence of the president of the State Bank, the funds paid to it by the directors of the National Bank were definitely treated as the payment by those directors of their anticipated stockholders' liabilities.

Whatever may have been the understanding or the intention of the State Bank prior to that time, this amounted to a definite construction of the contract and an election to treat those payments as collections on their stockholders' liabilities. As such, under the contract, those payments were to be applied on the judgment entered on the corporate note and credited on the directors' notes for the payment of which the corporate note was given as collateral.

It follows that by this practical construction of the contract concerning the payments made by the directors of the National Bank to the State Bank, such payments were treated as the payment by the directors of the National Bank of their anticipated stockholders' liabilities prior to the time the assessment was made against them by the Comptroller. They were so handled and treated, and accepted by the State Bank, as well as by the receiver and the Comptroller. Such payments were not treated by the State Bank as a part of the assets transferred by the National Bank to it. By so treating the payments made by the directors, any ambiguity or misunderstanding between the parties to the contract and the directors of the National Bank, as to the purpose for which the payments were made, was definitely settled. Such payments were regarded by all parties as advancements made in anticipation of the directors' stockholders' liabilities by the practical construction of the parties themselves. The record shows conclusively that the State Bank at no time subsequent to the execution of the contract treated the payments made by the directors as a part of the assets of the National Bank transferred to the State Bank.

Where the parties to a contract have adopted a particular construction of doubtful terms or conditions of the contract, the courts will follow the construction which the parties have placed upon it. *Wright* v. *Loring,* 351 Ill. 584; *Wurn* v. *Berkson,* 309 Ill. 520; *Geithman* v. *Eichler,* 265 Ill. 579; *Carroll* v. *Drury,* 170 Ill. 571.

It is also contended by appellant that after appellant acquired the notes in question from the State Bank, Bulkeley was a director of appellant and knew that the notes were carried as assets of that bank. It is insisted that he is estopped by certain acts and statements made by him with reference to the notes. The acts relied upon as an estoppel were the signing by him of the reports of bank examiners, who examined appellant from time to time, in which these notes were listed as assets of appellant. These examiners' reports merely listed the notes and the balance due thereon as assets of the bank. The statements relied upon are statements made by appellee Bulkeley to the bank examiners in substance that the notes were valid obligations; that they were good and would ultimately be paid. There is nothing in any of these acts or statements inconsistent with the present position of appellee Bulkeley. His statements were all true. The notes were, in fact, assets of appellant. They were amply secured and would ultimately be paid. There is no showing in the record, however, that he had any information or knowledge as to the amount of funds collected from other stockholders or from the stock of the St. Augustine Bank, and applied as credits on the notes, or as to any credits or payments endorsed on the notes. Neither did he have any information or knowledge as to whether the $36,850 had been credited on the notes, as he contends it should have been. There is nothing whatever in the acts and statements relied upon as against appellee Bulkeley inconsistent with his present position or which would operate as an estoppel against his defense of payment of the notes. The conclusions which we have reached render unnecessary the consideration of any other questions presented.

The judgment of the Appellate Court affirming the judgment of the circuit court of Knox county is affirmed.

*Judgment affirmed.*