**W. H. Furst, d/b/a Furst and Tilton, Plaintiff-Appellee, v. Board of Education, Highland Park High School District No. 113, Lake County, Illinois, Defendant-Appellant.**

**Gen. No. 11,196.**

Second District, First Division.

January 21, 1959.

Released for publication February 6, 1959.

Boyles and Fisher, of Waukegan, for appellant.

James A. Sprowl of Chicago (Thompson, Raymond, Mayer, Jenner & Bloomstein, of counsel) for appellee.

PRESIDING JUSTICE SPIVEY delivered the opinion of the court.

Plaintiff-appellee recovered a judgment in the amount of $34,176.54 in the Circuit Court of Lake County, Illinois, for architectural services. Trial was by the Court, a jury having been waived. From this judgment defendant-appellant appeals.

The various transactions and events covered a period of time from May 1948 to August 1953. A rather detailed recitation of the pertinent facts is necessary.

In the Spring of 1948, the defendant determined that it would enter into a building program for two schools in Highland Park and Lake Forest, Illinois, both under their jurisdiction. The president of the Board, Harold W. Norman, discussed the program with John A. Armstrong, a partner in the firm of Armstrong, Furst & Tilton. As a result of these conversa-

tions and certain inspections made by plaintiff's firm, a contract was entered into between Armstrong, Furst & Tilton and the defendant, dated June 15, 1948, and designated as "The Standard Form Of Agreement Between Owner and Architect." The relevant provisions are as follows:

"This Agreement made the 15th day of June in the year Nineteen Hundred and Forty-eight by and between Board of Education, Deerfield-Shields Township High School District, hereinafter called the Owner, and Armstrong, Furst & Tilton . . . , Witnesseth, that whereas the Owner intends to erect additions to Highland Park and Lake Forest High Schools.

". . . :

"The Architect agrees to perform, for the above-named work, professional services as hereinafter set forth.

"The Owner agrees to pay the Architect for such services a fee of six (6) per cent of the cost of the work with other payments and reimbursements as hereinafter provided, the said percentage being hereinafter referred to as the 'basic rate' and is to apply to this work except as modified elsewhere in this contract.

"The parties hereto further agree to the following conditions:

1. The Architect's Services.—The Architect's professional services consist of the necessary conferences, the preparation of preliminary studies, working drawings, large scale and full size drawings; specifications, large scale and full size drawings;. the drafting of forms of proposals and contracts; the issuance of certificates of payment; keeping of accurate accounts, the general administration of the business and supervision of the work.

3. Separate Contracts.— . . . .

4. Extra Services and Special Cases.—If the Architect is caused extra draughting or other expense due

207

to changes ordered by the Owner, . . . , he shall be equitably paid for such extra expense and the service involved.

. . .

If any work designed or specified by the Architect is abandoned or suspended the Architect is to be paid for the services rendered on account of it.

5. Payments.—Payments to the Architect on account of his fee shall be made as follows, subject to the provisions of Art. 4:

Upon completion of the preliminary studies, a sum equal to 20% of the basic rate computed upon a reasonable estimated cost.

Upon completion of specifications and general working drawings (exclusive of details) a sum sufficient to increase payments on the fee to 75% of the rate or rates of commission arising from this agreement, computed upon a reasonable cost estimated on such completed specifications and drawings, or if bids have been received, then computed upon the lowest bona fide bid or bids.

From time to time during the execution of work and in proportion to the amount of service rendered by the Architect, payments shall be made until the aggregate of all payments made on account of the fee under this Article, but not including any covered by the provisions of Article 4, shall be a sum equal to the rate or rates of commission arising from this agreement, computed upon the final cost of the work.

. . .
. . .

6. Survey, Borings and Tests.— . . .

7. Supervision of the Work.— . . .

8. Preliminary Estimates.—When requested to do so the Architect will furnish preliminary estimates on the cost of the work, but he does not guarantee the accuracy of such estimates.

208

9. Definition of the cost of the Work.— . . .

10. Ownership of Documents.—Drawings and specifications as instruments of service are the property of the Architect whether the work for which they are made be executed or not.

11. Successors and Assignments.—The Owner and the Architect, each binds himself, his partners, successors, executors, administrators, and assigns to the other party to this agreement, and to the partners, successors, executors, administrators, and assigns of such other party in respect of all covenants of this agreement.

Except as above, neither the Owner nor the Architect shall assign, sublet or transfer his interest in this agreement without the written consent of the other.

12. Arbitration.— . . .

13. . . .

14. . . .

The Owner and the Architect hereby agree to the full performance of the covenants contained herein."

The school buildings could be erected by defendant only if a bond issue were approved at a public referendum, and it was necessary to have the architect's plans and cost estimate before the issue could be lawfully submitted to the referendum. As a result of an interchange of letters between the parties, the agreement of June 15, 1948, was amended by letter dated February 7, 1949, from Armstrong, Furst & Tilton which letter insofar as it is of interest in this case stated,

"Highland Park. Estimated cost of building $1,400,000.00.

"Total estimate for equipment $41,500.00.

"Lake Forest building estimate $630,000.00, Building equipment estimate $34,000.00.

"Our letter of June 7, 1948, addressed to Mr. Norman, called attention to the fact that our contract with the

Board states that fee for preliminary drawings is to be 20% of basic fee of 6% or .012% of estimated cost and stated that 'this is the fee which generally speaking, will apply to preparation of drawings needed before a bond issue is put to vote, but as I said when in your office, if the bond issue drawings require less work than included in this .012 fee, we will reduce our charges accordingly.'

"For a fee of .012 on estimated cost of this work or for a net sum of $25,000.00, which price is to include work already completed, we will further develop plans and do sufficient structural and mechanical engineering work so that a set of preliminary bids can be obtained in all lines of work, and cost can be determined to a point within 5% of correct total. . . .

"If this procedure is adopted it will take about two months to develop drawings and get estimates."

On February 17, 1949, after having received preliminary plans and reestimated costs, the Board by letter accepted the contract modification as set out in plaintiff's letter of February 7, 1949, and tendered their school warrant for $4,500 in payment of recent statement.

In the month of June, 1949, Armstrong, Furst & Tilton furnished two sets of drawings for the Highland Park and Lake Forest projects. The Highland Park plans covered a new gymnasium; a swimming pool; seats for both; an auxiliary gymnasium; an auditorium; a cafeteria, kitchen, serving rooms; locker rooms; and a running track on the ground floor at bottom level. By June 30, 1949, the mechanical drawings were complete.

The defendant on July 14, 1949, notified Armstrong, Furst & Tilton by letter, that Lake Forest High School had been detached from defendant's district as of June 30, 1949, and that the drawings had been turned over to the respective principals of the two schools. De-

fendant said that due to the conditions the Board would not take any action relative to building for at least six months and that it was the Board's opinion that it probably would be a waste of time getting estimates of costs. The Board hoped that conditions would be such that they would be in a position to instruct the architect to proceed in the Fall.

On November 21, 1949, the architects advised the Board by letter that on August 1, 1949, the work for Highland Park was 95% completed. They stated that they then had preliminary bids on the work and that the architectural, mechanical, and structural drawings were complete and ready for delivery. Plaintiff stated that if no more work was to be done on the Lake Forest project, a credit of $1,850 would be allowed and that the balance on account would be due after delivery of plans, bids, etc.

In January of 1950, Mr. Armstrong was requested to investigate possible hazards in connection with the present Auditorium building. He advised the Board of his recommendations and added that he felt Shields Hall was more dangerous than the Auditorium building. On February 9, 1950, the Board requested his advice on Shields Hall stating the building would probably be used for another ten years. Armstrong replied to this letter making certain recommendations for which he was paid a separate fee.

On February 13, 1950, the architects furnished the Board additional plans together with bids to build the Highland Park building, which bids including equipment totaled $1,442,959. On March 7, 1950, the Board acknowledged the February 13, 1950, communication and stated that no action was taken but that it was hoped that it would not be too long before conditions would permit the Board to act.

At the time of the letter of February 13, 1950, the architects forwarded their statement for services show-

211

ing a balance due of $1,650, after allowing a credit of $1,850 on the Lake Forest project. This balance was paid on March 20, 1950, and in the Board's covering letter it was stated in part, "This payment of $1,650.00 clears our account with you. This letter will also serve to acknowledge receipt of plans and sketches as mentioned in your last letter."

From the evidence at this juncture, we must conclude that Armstrong, Furst & Tilton had concluded that portion of the contract of June 15, 1948, as modified by their letter of June 7, 1948. No further work was done by plaintiff under the contract.

In September 1950, John A. Armstrong withdrew from the firm of Armstrong, Furst & Tilton. The defendant's first notice of Mr. Armstrong's withdrawal from the partnership was in April of 1952.

The Board did nothing about the erection of additions to Highland Park and Lake Forest High Schools until the final court decision in early 1952 wherein the disconnection of Lake Forest High School was upheld. In the meantime, an entire new Board for the defendant had taken office. At this time the Board reexamined the needs for Highland Park High School taking into consideration, the population increase in the district, the condition and inadequacy of Shields Hall, the needs of the music department, industrial arts department, cafeteria and athletic program, and the fact that the building program must be predicated upon an enrollment of at least two thousand students.

About the middle of April 1952, the Board contacted Armstrong, Furst & Tilton requesting a meeting. Mr. Furst appeared, at which time he informed members of the Board that Mr. Armstrong was no longer a member of the firm. He was told that the Board was abandoning the old project because it needed a much larger school and that it was decided they would do the whole program at once. Pursuant to this meeting,

212

Mr. Furst made certain recommendations along the lines discussed at this meeting and reported them to the Board.

Mr. Furst by invitation of the Board together with other architects appeared before the Board for an interview relative to the new project. Following this interview on August 16, 1952, the Board determined to retain an architect other than the plaintiff. The plaintiff was so notified on August 18, 1952, and on August 28, 1952, was notified in writing that the Board had abandoned all of the work designed or specified by the firm of Armstrong, Furst & Tilton under the contract of June 15, 1948, and all plans and papers were returned.

On September 10, 1952, the Board employed another architect to design and build a project which included remodeling of the old gymnasium, the East building, the auditorium, the industrial arts building, the power house, and the construction of an academic building in the place of Shields Hall, cafeteria, shops, music building, and physical education building.

Defendant, for reversal, contends inter alia that contract condition number four permits the owner (defendant) to abandon the work, contemplated by the recital, at any stage of the undertaking upon payment of the fees for services rendered as provided in contract condition number five, and further that defendant had abandoned the work so contemplated in the recital.

Condition number four of the contract in so far as it applies to abandonment provides,

"If any work designed or specified by the Architect is abandoned or suspended the Architect is to be paid for the services rendered on account of it."

Defendant urges this Court to construe the word "work" in condition number four as characterized by the words "designed or specified" in a limited sense,

213

viz: that if the work product (plans and specifications) of the building designed and specified by the plaintiff is not erected (abandoned) then the plaintiff shall be compensated for his services rendered to that point only. Plaintiff on the other hand suggests the word "work" to mean the project contemplated in the contract recital for which plaintiff agreed to perform professional services "for the above named work" viz: "additions to Highland Park and Lake Forest High Schools,". and concedes that if defendant has in fact abandoned the project, plaintiff's recovery would be limited to compensation for work done.

Assuming, but not so holding for we hold to the contrary, that plaintiff's interpretation of the word "work" contained in contract condition number four is the correct one, it becomes necessary to give meaning to that portion of condition number four above quoted relating to abandonment, insofar as it fixes the relative rights and liabilities of the parties if there has in fact been an abandonment.

The Supreme Court of Wisconsin in Mitterhausen v. South Wisconsin Conference Ass'n of Seventh Day Adventists et al., 14 N.W.2d 19, 245 Wis. 353, was called upon to construe the identical provision in a contract which appears to be one issued by the American Institute of Architects. The project was abandoned at a time when the architect had completed work entitling him to a fee of 60% of the basic rate computed on a reasonable estimate of cost. Similar provisions were contained therein relating to the payment of fees as provided in condition number five of the instant contract. The court said,

" 'We are of the view that the trial court was in error in allowing plaintiff an additional 40% (or the balance of his commission) upon the theory that he was wrongfully prevented by plaintiff's breach from performing the supervisory and other work by which he would

214

normally earn that part of his commission. As we read the contract it contemplates that the owner may abandon the enterprise without committing a breach.

'Article 4 of the contract provides:

' . . .

'If any work designed or specified by the Architect is abandoned or suspended the Architect is to be paid for the service rendered on account of it.

'We think that this clause plainly means that upon abandonment the architect is entitled to commission upon the work done by him up to the time of abandonment or suspension but that the abandonment or suspension is not a breach of the contract permitting him to recover damages for loss of opportunity to complete the contract. In this connection see 6 Corpus Juris Secundum, Architects, Sect. 16, at page 314, for cases dealing with this point.' "

In Llewellyn v. Board of Education Cicero-Stickney Tp. Dist., 324 Ill. 254, 154 N. E. 889, affirming Llewellyn v. Board of Education, Cicero-Stickney Tp. Dist., 242 Ill. App. 632 (Abst.), the defendant by resolution employed the architect plaintiff to draw plans and specifications for remodeling a school building. Plaintiff was to be paid eight percent of "all work approved and let," the Board reserving the right to discontinue any and all work at any time and if so discontinued the compensation of the plaintiff was to be established by the Schedule of the American Institute of Architects. Plaintiff prepared plans and specifications but no work was let under these plans and specifications. Defendant contended that since no work was let under the plans and specifications, the plaintiff could not recover any sums for his work, the project having been abandoned.

The Supreme Court in rejecting this contention said, "The resolution contemplated paying appellee certain fees if the work was abandoned or suspended before

215

it was let. The contract should be construed as a whole and not from particular phrases, and the whole instrument should be given effect, if possible."

The court pointed out that article 8 of the schedule of the American Institute of Architects provided that should the work, or any part of it, be abandoned or suspended, the architect is to be paid in accordance with or in proportion to the terms of the article 9 for the services rendered up to the time of abandonment or suspension and that article 9 provided that whether the excution of the work be suspended or abandoned in part or whole, payments are to be made under the provisions of article 8 which provided for percentage payments at different stages of the architect's completed services.

The court then said, "The reasonable interpretation of the contract is, we think, that if the work was done under the supervision of the architect he was to have a fee of eight percent of the cost of all the work, but in the event appellant decided to abandon or discontinue the work, he was to be compensated according to the schedule of the American Institute of Architects, and the amount judgment was rendered for was in accordance with that schedule."

To like effect, Miller et al. v. San Francisco Church Extension Society of Methodist Episcopal Church et al., 13 Pac.2d 824, 125 California 85, wherein the court said:

"That paragraph reserved to the employer the right to abandon the enterprise and fixed the measure of its liability. When thereafter it exercised its right of abandonment, such act on its part was not an unlawful discharge of the plaintiffs. (Citing authorities). . . . That paragraph 8, as quoted, is in legal effect a reservation to the employer of the right to abandon, is clearly supported by authorities. (Citing authorities)."

216

■ Giving effect to all of the contract provisions and to the contract as a whole, we find no compelling reason to distinguish the application of the rule of liability upon abandonment as announced in the Mitterhausen, Llewellyn, and Miller cases. No authority being cited to the contrary we hold that the rules therein stated are applicable to the instant contract and they are so adopted by this court.

Having concluded as we have, the plaintiff is entitled to be paid for professional services *rendered* to the date of abandonment of the project, namely, August 28, 1952, if there has in fact been an abandonment. Necessarily we must now determine whether or not there was an abandonment of the project *intended* to be erected under the contract of June 15, 1948. If there has been an abandonment in fact, the plaintiff is not entitled to recover any sums in excess of the $25,000 paid in accordance with the contract as modified by the letter of February 7, 1949.

■ While there are many basic rules of construction applicable to contracts, we believe it well to bear in mind three of such rules, viz., (1) An instrument is to be construed most strongly against its author. Cedar Park Cemetery Ass'n v. Calumet Park, Village of, 398 Ill. 324, 75 N.E.2d 874, and Spitz v. Brickhouse, 3 Ill.App.2d 536, 123 N.E.2d 117, an A. I. A. form contract, (2) Where language has been used in a contract that is ambiguous, previous and contemporary transactions and facts may be taken into consideration to ascertain the true meaning of the contract and the sense in which the parties used the particular term. Olson v. Rossetter, 399 Ill. 232, 77 N.E.2d 652, and I. L. P. Contracts, Sect. 212, and (3) In construing the meaning of the terms of a written instrument the court will endeavor to place itself in the position of the contracting parties and interpret the instrument in view of the circumstances surrounding it at the time it was made, considering the objects and purposes the parties

217

had in mind, so that the court may understand the language used in the sense intended by the parties using it. Kurth v. Forreston State Bank, 348 Ill. App. 581, 109 N.E.2d 795; Gillett v. Teel, 272 Ill. 106, 111 N. E. 722; Stedman v. Tate, 326 Ill. 442, 158 N. E. 97; I. L. P. Contracts, Sect. 212.

Referring to the contract of June 15, 1948, prepared by the architects, we find that the subject was "Owner intends to erect additions to Highland Park and Lake Forest High Schools." By letter dated February 7, 1949, modifying the contract, this work was further characterized as a building for Highland Park High School, the estimated cost being $1,400,000, plus equipment estimated at $41,500, and a building for Lake Forest High School, the estimated cost being $630,000, together with $34,000 worth of equipment.

As a result of the disconnection proceedings, both parties abandoned the Lake Forest building, and the plaintiff insofar as that building was concerned was paid for services rendered to the time of abandonment. Plaintiff asserts no further claim on the Lake Forest building.

Plaintiff, however, continued his services on the Highland Park building to the extent agreed upon in plaintiff's letter of February 7, 1949. For these services rendered, plaintiff was paid $25,000 as agreed upon by that letter. No further services were rendered before August 28, 1952, the date of the alleged abandonment of the June 15, 1948 contract, except an inspection of and recommendations for Shields Hall and the old Auditorium for which plaintiff was paid a separate fee.

The plans and specifications designated as the preliminary drawings were for a single building incorporating a gymnasium, natatorium, auditorium, and cafeteria, and was to contain about 2,000,000 cubic feet accommodating about 1,600 students. No work or replacement was contemplated for any of the existing

buildings. This was the "project," "building," or "work" intended to be designated by the contract as "additions to Highland Park and Lake Forest High Schools."

In the Spring of 1952, the Board determined that the Highland Park High School facilities were inadequate and that the entire facilities should be unified inside and out. The Board made an independent study of the needs, held public hearings, and then decided that the building program should encompass the following; the razing of Shields Hall and its replacement with a much larger academic building, the construction of a new building for music and manual arts integrated with Sandwich Hall, an enlarged heating plant, the construction of a larger building for a gymnasium, cafeteria, natatorium, and auditorium constituting 2,311,000 cubic feet as opposed to 2,000,000 cubic feet for the building considered in 1948, and the integration of all the new and old buildings (except the power house) by passageways. The project was based upon the enrollment of 2,000 students as opposed to 1,600 students in 1948.

On August 16, 1952, Mr. Furst appeared before the Board by invitation together with other architects to discuss the new project at which time he stated his fees would be six percent on architectural work and eight percent on engineering work, the same as in the 1948 contract. He made no mention of using the plans contemplated by the old contract.

Plaintiff relys upon the case of Altman v. School District of City of Uniontown, 5 A.2d 896, 334 Pa. 336, to sustain his position that there has been no abandonment of the 1948 contract. In opposition defendant cites Gauntt v. Chehalis County, 129 Pac. 888, 72 Wash. 106.

In the Altman case, the plaintiff was employed by the defendant school board to prepare plans and specifications for "an addition to the high school build-

219

ing." Altman delivered to the board plans and specifications which were then 85% complete, together with his bill for $3,300. The board paid $2,000 on account with the understanding that there be no further bills presented or paid until the contract was let for the erection of the building. No contract for building under Altman's plans was ever made. Some twelve years later another architect was employed for "an addition to the Senior High School Building," which was built.

Plaintiff brought suit for compensation for the part of the work actually performed and the trial was had upon that theory. During the trial judge's charge to the jury he stated that the correct measure of damages was, "Where a party has partly performed an entire contract and is prevented from completing performance by the act of the other party, he may recover in an action on the contract, and the measure of damages is the contract price less the cost of completing the work." Judgment was entered on that theory and the same was affirmed.

The court stated in its opinion that the facts amounted to a breach of plaintiff's contract; that plaintiff prepared and delivered the plans and that they still remain in defendant's possession; and that another building was to be located on the same site.

We find the Altman case is not compelling in the instant case. There, the terms of the contract were not set out in the opinion, we are not informed on whether or not the contract contained an abandonment clause, and it is not disclosed whether or not the building designed under the new architect was the same as the building intended to be built under plaintiff's contract.

In the Gauntt case, the plaintiff was employed to and did prepare plans and specifications for a court house building. The contract incorporated a provision as follows: "It is understood and agreed by both parties to this contract that, should contract for building not be let, then the party of second part is to receive

220

the sum of one thousand dollars ($1,000) only for plans and specifications, same to be applied as part payment in the event of the building going ahead at some future time." Plaintiff was paid the specified $1,000 but brought suit for the full compensation provided for by the contract, including profits, when the defendant built a court house about three years later using plans and specifications prepared by another architect. Judgment was had for the defendant which was affirmed. It was said by the court, "The term 'the building' in the paragraph of the contract quoted, refers to the building to be erected under the plans and specifications prepared by the appellant. It does not refer to a building that might be erected according to plans and specifications prepared by any other architect. The contract does not obligate the respondent to erect a building according to the plans and specifications of the appellant. The obligations of the respondent under the contract were fulfilled when the appellant was paid the $1,000, unless it should subsequently erect a building according to the appellant's plans and specifications. The evidence shows that this it did not do."

We conclude that the evidence demonstrates that the defendant abandoned the erection of buildings contemplated and intended by the contract of June 15, 1948, and that under the contract the plaintiff was limited to compensation for services rendered to the date of abandonment which he has been paid.

We have previously noted that we are unable to concur in plaintiff's interpretation of the word "work" in contract condition number four. We have been unable to bring to light a single case wherein the same or similar language of this standard form of agreement has been interpreted.

The Gauntt case, while dissimilar in contract terminology, holds that upon an abandonment of the plans and specifications (work product) of the architect, the

221

owner is at liberty to proceed under the plans of another architect without incurring any further liability to the former architect so long as the plans and specifications of the first architect are not used. We believe this to be a sound interpretation of the instant contract giving effect to all of the language contained therein.

The defendant had the right to abandon the contract without breach or further liability thereunder upon paying the architect for services rendered up to that time. Mitterhausen v. South Wisconsin Conference Ass'n, 14 N.W.2d 19, 245 Wis. 353; Miller et al. v. San Francisco Church Extension, 13 Pac.2d 824; Llewellyn v. Board of Education, Cicero-Stickney Tp. Dist., 324 Ill. 254, 154 N. E. 889.

The instant contract is a severable or divisible contract.

In Bank of Antigo v. Union Trust Co., 149 Ill. 343, 36 N. E. 1029, it was said, "The rule as laid down by Parsons (Vol. 2, p. 517) is: 'If the part to be performed by one party consists of several distinct and separate items, and the price to be paid by the other is apportioned to each item to be performed, or is left to be implied by law, such a contract will generally be held to be severable.'" To like effect: Keeler v. Clifford, 165 Ill. 544, 46 N. E. 248; Metropolitan Trust Co. v. Fishman, 323 Ill. App. 413, 55 N.E.2d 837, and Barrie v. Jerome, 112 Ill. App. 329.

The instant contract, like the contract in the Gauntt case, contains no agreement to complete the building program as designed and specified by the plaintiff. The contract expresses only an intention to erect additions to the two schools.

Under the terms of the contract no reasons need be assigned by the owner providing the architect is *paid for the services rendered on account of it.* The owner had agreed to pay the architect on account of his fee according to the schedule set out in contract condition number five.

The services of an architect are of a highly creative nature. At the time the contract of employment is entered into the parties wish to obtain some general objective as demonstrated by the instant contract wherein it was said "That whereas the Owner intends to erect additions to Highland Park and Lake Forest schools." The contract is even silent as to the nature of those additions. The architect under his agreement submits preliminary plans and specifications and is entitled to a percentage of his fee regardless of any further developments. At this point if we were to adopt plaintiff's thinking the owner would be entirely in the hands of the architect if he or she ever wished to carry out his or her general objective. Such an interpretation could lead to grave inequities which the law will not permit. Simon v. Etger, 107 N. E. 1066 (N. Y.).

The architect could design the structure in any fashion and if the owner wished changes he would be subject to further charges as provided by contract condition number four.

We conclude that the instant contract as prepared by the plaintiff should be treated as a severable or divisible contract and that the owner has the right to abandon the plans and specifications as prepared by the architect upon paying for the services then rendered without breaching the contract.

Other grounds for reversal have been urged which we do not deem necessary to pass upon in view of what has been said.

The judgment of the Circuit Court of Lake County is reversed and judgment entered here for the appellant.

Reversed with judgment here.

DOVE and McNEAL, JJ., concur.