Ben Sampson, Trading as Mid-Continent Press, Appellee, v. Arthur Marra, Trading as Marra Program and Past Performance Form, Appellant.

### Gen. No. 10,451.

Opinion filed April 19, 1951. Released for publication May 8, 1951.

GREGORY, GILRUTH & HUNTER, of Chicago, for appellants; ROBERT L. HUNTER, of Chicago, of counsel.

ROBERT E. DOLPH, and SEARS & STREIT, of Aurora, for appellees;· ROBERT E. DOLPH, and EDWARD F. STREIT, of Aurora, of counsel.

MR. JUSTICE BRISTOW delivered the opinion of the court.

The circuit court of Kane County, in a trial without a jury, entered judgment in favor of plaintiff, Ben Sampson, trading as Mid-Continent Press, in the amount of $4,656 for the alleged breach of a printing contract by defendant, Arthur Marra, trading as Marra Program and Past Performance Form, from which judgment defendant has appealed. The essential issue is whether the judgment of the trial court is against the weight of the evidence.

It appears that plaintiff operated a small print shop wherein the planograph method of printing was used. On March 17, 1949, plaintiff wrote a letter to Edwin

Dygert, general manager and vice-president of the Fox Valley Trotting Club, confirming a telephone conversation in which plaintiff offered to print the programs for Aurora Downs during the harness racing season. Dygert agreed to refer plaintiff's offer to defendant, Arthur Marra, who was handling the programs for the Racing Meet at the track, and, after negotiations, a contract was signed by plaintiff, Ben Sampson, and defendant, Arthur Marra, on April 28, 1949. The contract provided:

"It is agreed that Mid-Continent Press will furnish programs; that Marra Past Performance Form will accept and pay for the programs for the spring racing meet of 1949. Prices will be as follows: The minimum to be furnished and accepted will be 2,500 programs for each day, and for 9 race programs: 2,500 @ 8½¢ each; 3,500 to 4,500 @ 8¢ each, and over 4,500 @ 7½¢ each.

"1. All scratches will be called in between 9 and 9:15 A. M. each day of the races.

"2. Copy of the program will be furnished by 1 P. M. two days before.

"3. Programs will be available for newsstand sales by 2 P. M. the day before the race.

"4. Proofs will be furnished to the track by 5:30 P. M. the day before the race.

"5. Payment for the programs will be made each week for programs printed the previous week.

"6. All copy is the property of Marra.

"Signed: Arthur Marra
W. B. Sampson"

Under the printing process used by plaintiff, a typing machine prepares an image which is photographed, and the negative is used to make a metal plate that is wrapped around a cylinder on an off-set press, where the plates are inked, and the copy printed. Prior to the contract being signed, plaintiff showed defendant vari-

248

ous styles of type on silver proofs, or photographs of the typewritten copy. Defendant insists that plaintiff assured him that the final programs would be darker, after the inking and printing, than the silver proofs. Defendant and Dygert selected a particular style of type, other than the one recommended by plaintiff, which style was later adopted. At the time of the negotiations defendant showed plaintiff a program from an Arizona Race Meet, and plaintiff stated that he could make a program just as good, although the parties knew that the Arizona program was printed by the letter press method, and that plaintiff used the off-set or planograph method. It is undisputed that plaintiff's price was lower than that demanded for letter press printing.

The evidence is controverted as to whether plaintiff purchased new equipment, including a stitching machine, a whirler, a vacuum frame, and a stapler pursuant to the contract or prior thereto; however, it was established that plaintiff did subcontract part of the set-up work to a Chicago firm which photographed the copy and sent him the negatives from which he made the plates, and that plaintiff enlarged the personnel of his shop from 2 to 8 employees.

No printed proof or printed sample was furnished to defendant until the first night of the races, on May 9, 1949. Defendant states that not only were the programs illegible under the lights, but letters and figures were broken and blurred, numbers were up-side down, there were interlineations, some pages were not cut, margins were short, stapling was bad, and customers brought some of the programs back and demanded new programs or refunds.

After several days during which the programs continued to be unsatisfactory, according to defendant's testimony, plaintiff offered and agreed to change the style of type to that which he originally suggested. In-

asmuch as the racing program is essentially comprised of statistics of past performances of all the horses running in all of the races on a particular night, plates showing this data on most of the horses were, of necessity, set up ahead of time. Therefore, when this change in style was required, plaintiff endeavored to change the plates accordingly each time a horse came up to run, but all the past performance records could not be converted at once, according to plaintiff, hence some of the records appeared in two different styles of type. Moreover, defendant demanded, and plaintiff agreed to insert "add lines" or "run backs" which pertained to the latest performance of the horse after the original copy had been set up and the proofs prepared. These late "add lines" were set up in the new type.

Defendant maintains that these "add lines" of the latest performance of the horses were included under the provision of the contract that specified that "all scratches be telephoned in between 9:00 and 9:15 A. M. each day of the races." Plaintiff, however, maintains that these latest performance records were not "scratches," for the term "scratches" had a definite meaning and referred to the elimination or changes in the horses that were running, and that the inclusion of the "add lines" was an extra service which he gave defendant outside of the contract. These latest performance records were not always included in the programs.

After less than half of the meet was over, defendant informed plaintiff that the contract was cancelled, and proceeded to have the programs printed on a letter press at a cost of about 23¢ a program. Defendant refused to make any financial adjustments with plaintiff for any special equipment and supplies plaintiff had on hand in connection with the contract.

In support of his contention that the cancellation of the contract was justified, defendant offered the

testimony of Orin Baker, the State Steward for the Illinois Harness Racing Commission, Edwin Dygert, the General Manager of the track, and Morrie Kurlansky, the chart man who compiled the data on the horses and corrected the proofs. Inasmuch as the issue herein is whether the verdict is against the weight of the evidence, we are constrained to review the testimony.

Baker stated that on occasions they had to go through several programs in the Judge's Stand to find one that was satisfactory. He noted that an owner's name was left out, that margins were cut off some of the programs; and had conferences with Marra and Dygert on the inadequacy of the programs. His principal objection, however, as brought out on cross-examination, was that the latest performances of the horses were not always given. He had no knowledge of the terms of plaintiff's contract, or whether such information was required thereunder. Nor did he know of any particular name for late performance data, however, the performance data on a horse in a race the night before was not regarded by him as a "scratch." When shown some of plaintiff's exhibits, copies of programs which had not been delivered to defendant, and which were admitted in evidence over defendant's objection, Baker noted that they appeared legible and satisfactory. He also admitted that he had no difficulty with the stapling of the programs he had used.

Dygert, after testifying to the preliminary negotiations and solicitation of the work by plaintiff, and prior business dealings with plaintiff in 1946, stated that at the time the styles of type were presented, he questioned whether they were dark enough, and was assured by plaintiff that when the programs were printed they would be darker and heavier.

With reference to the alleged inadequacies in the first night's programs, he stated that the margins on

251

some of the programs were short on the right side, the stapling bad, not all of the abbreviations could be accurately read, and that plaintiff had stated that he couldn't make them any smaller. Dygert further testified that he told both plaintiff and defendant that the programs had to be improved for they were receiving too many complaints from the public and the State Commission that the programs were not distinct or heavy enough to be legible under the lights. He admitted that the programs were improving, but were still not good enough for their purpose. When plaintiff came to his office stating that he learned that defendant was arranging for someone else to print the programs, Dygert admitted it, and explained that plaintiff had taken a job he could not do, but that Dygert would help him by taking the covers and programs off his hands.

On cross-examination, Dygert stated that they could have used plaintiff's covers, but he did not know whether they did. He admitted that he and defendant selected the original style of type, but later found that under the lights it was difficult to read. Upon examining plaintiff's exhibits, he stated they appeared all right, except that the type was not heavy enough, and admitted that some programs were all right, but that others had to be replaced. He reiterated the general inadequacies, and concluded that the one thing that was at fault was that it was not deep enough or black enough under the lights, nor was there late information on the immediate past performance of the horses in all cases.

The witness Kurlansky pointed out some 35 errors noted on the proofs that which were not corrected on the programs. He stated that at no time was he able to take a bundle of programs and distribute them without going through them to cut pages apart. The errors were mostly typographical, or failure to put in an

252

"add line," or lack of a space between a name, or an inverted name, and that these defects appeared in, not the worst, but the best programs made by plaintiff. He admitted that there were 9 races per night, and 8 horses in each race on which data was given, and that he, at no time, approved any of plaintiff's styles of type or his method of printing. However, after the contract was cancelled and the letter press printing adopted, according to his testimony, all the errors were corrected. He defined a "scratch" as not only when a horse is withdrawn or changed, but as including any other items on the program which are changed, such as additions of the latest performance records.

Plaintiff testified that he sustained not only a loss of profit, but had a claim against him for $1,000 by the Chicago Art & Copy firm, which statement was corroborated by the owner of the firm. Plaintiff explained that he had to limit his subsequent contracts, because he was on a cash basis with his suppliers and had depleted his cash by purchases of equipment, covers, and other special supplies needed on defendant's job. He stated that he originally urged the adoption of the bolder faced type, which was subsequently resorted to by defendant after the style originally selected by defendant did not seem adequate to him.

On recall, plaintiff testified that defendant refused to purchase the covers, or get together on the costs that had been incurred. In defining a "run back" or "add line," plaintiff stated that when a horse would run one night, and then again the next night, the latest past performance as an "add line," whereas a "scratch" meant the removal of the name of a horse and substitution of another in its place. He emphasized the difference in the work involved between merely making a "scratch," and in inserting an "add line." A "scratch" involved putting in the name of a new horse with his whole performance record, which

253

was already made up, whereas the inclusion of an "add line" involved typing up the new copy, photographing it, and making a new negative and plate. Plaintiff asserts that this additional work was not included in the terms of the contract.

On the basis of substantially the foregoing facts, the circuit court entered judgment for plaintiff in the amount of $4,656 and costs. Under the Illinois Civil Practice Act, the reviewing court may in any civil case review errors of fact, in that the judgment appealed from is not sustained by the evidence, or is against the weight of the evidence. (Ch. 110, par. 216.) This court is therefore authorized to examine the evidence and determine whether or not the verdict is against the weight of the evidence. (*Mabee v. Sutliff*, 404 Ill. 27, 31.)

On this appeal defendant argues that the evidence establishes that plaintiff breached certain warranties as to quality and fitness of the programs, entitling defendant to cancel the contract, and that plaintiff's inability to perform under the contract also warranted defendant's cancelling the agreement.

Plaintiff, however, contends that the verdict was amply supported by the evidence, and that the evidence establishes that this was a sale by sample, that defendant cancelled because the style of type he originally selected was not bold enough to be legible under the lights, and that the inaccuracies were negligible, but seized upon as a justification for cancelling the contract.

With reference to defendant's assertion that there was a breach of warranty, the relevant portion of the Uniform Sales Act provides:

"Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular

254

purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose." (ch. 121½ § 15, Ill. Rev. Stat. 1949) [Jones Ill. Stats. Ann. 121.19].

 Even though an essential element of the statute is the buyer's reliance on the seller's skill and judgment, and plaintiff knew the purpose for which the programs were intended, since defendant and the track manager selected the style of type to be used, there could be no implied warranty of fitness. Plaintiff's statement that he could make a good program, one as good as the Sportsman's Park program which all the parties knew was made by a different and more expensive printing process, could not be interpreted as tantamount to a warranty that all of the programs would be legible at night under the lights of the track.

██ ██ On the other hand, we cannot sustain plaintiff's assertion that this was a sale by sample, precluding defendant from objecting to any program following the sample, since plaintiff admitted in his testimony that defendant did not see samples of the program until the first day of the Meet, but merely chose the style of type from the silver prints made from the negatives. Nor would defendant's selection of the style of type preclude him from objecting to the quality of the printing, for the appearance of the programs depends not only upon the style of type, but upon the inking and other acts in the printing process.

Therefore, the salient inquiry is whether the alleged inadequacies of the program constituted a failure of

255

substantial performance by plaintiff warranting defendant's rescission of the contract.

It is established that a party may terminate or rescind a contract because of substantial nonperformance or breach by the other party. (17 C. J. S. § 422; *Atwell Printing & Binding Co. v. Prairie Farmer Publishing Co.*, 246 Ill. App. 100.) Ordinarily the determination of what constitutes failure of substantial performance is an issue for the trier of fact.

In the instant case, the facts with reference to the inadequacies of the programs are controverted. Plaintiff explains that these errors, appearing in some programs, were negligible compared with his total performance in preparing thousands of programs each night, involving 9 races a night, with 8 horses participating in each race, with the extensive past performance data on each horse, for the 17 nights that plaintiff was allowed to proceed with the contract. From the evidence, it cannot be stated that the errors alleged were so glaring as to constitute per se a failure to substantially perform.

Plaintiff points out that defendant selected the style of type, and when defendant considered it unsatisfactory, the parties then adopted the bolder faced style of type originally recommended by plaintiff, which proved to be more legible under the lights. The record reveals that this method of printing is less expensive than letter press printing, affording defendant a greater measure of profit, but darkness of the print on all of the pages may not be as uniform as under a letter press job, and last minute "add lines" could not be inserted under this method as smoothly as under letter press printing. If such late data were an integral part of the requirements for a program—and it was according to the testimony of the State Steward—then, in the light of all the other circumstances, the trial court may have concluded that defendant, in an effort to

256

limit expenses, selected a method of printing which was unsuitable to his needs. Furthermore, the record does not conclusively establish whether the legibility at night was governed by the nature of the printing process, or by the quality of plaintiff's work. It is evident that some of the programs were indistinct, and that some were very legible, and it was for the trial court to determine whose testimony to believe in ascertaining the proportion of the programs which were unsatisfactory and why.

 It should also be noted that the evidence does not establish that the inclusion of the "add lines" with the latest performance data could properly be deemed within the terms of the contract. The contract provided that all copy (the subject matter of the program) be furnished by 1 P. M. two days before the race, and that plaintiff furnish the proofs to the track by 5 P. M. the day before the race. To comply therewith would, of necessity, preclude the inclusion of data on the performance of the horse later that night. However, the contract also included the provision that all "scratches" be called in between 9 and 9:15 A. M. the day of the race.

 With reference to the meaning of the term "scratches," the presiding Judge at the Meet, as well as plaintiff, testified that reports of the recent performance of a horse were not considered "scratches," but that the term referred only to substitutions or withdrawals of the names of horses in the races. However, the witness who collected data on the horses and checked the proofs testified that all changes and additions in the program were deemed "scratches." In view of this conflicting testimony, it cannot be held that the evidence conclusively established that plaintiff's failure to include in all the programs the late performance records of the night before, after the proofs had been made up, constituted a breach of contract. Hence,

■■■■■■■■■■■■■■■

the most serious objection to the programs, offered by the State Steward, i. e., that they did not always include the latest performance data, was not the result of plaintiff's failure to perform his part of the contract.

■■■ On the basis of the foregoing, it is our judgment that the finding of the trial court, acting as the trier of fact in this proceeding, cannot be deemed contrary to the manifest weight of the evidence. Therefore, the judgment of that court in favor of plaintiff is affirmed.

*Judgment affirmed.*