Weiland Tool & Manufacturing Company, Plaintiff-Appellee, v. Emerson C. Whitney, Defendant-Appellant.

Hexarmour Company, an Illinois Corporation, and Emerson C. Whitney, Counter-Plaintiffs-Appellants, v. Weiland Tool & Manufacturing Company, an Illinois Corporation, Counter-Defendant-Appellee.

Gen. No. 48,020.

First District, First Division.

March 11, 1963.

Rehearing denied March 27, 1963.

71

Emerson C. Whitney, of Chicago (William C. Wines, of counsel), for appellants and cross-appellee.

Mortimer, Nolan, O'Malley & Dunne, of Chicago (Robert J. Nolan and John C. Ambrose, of counsel), for appellee-cross-appellant.

MR. JUSTICE ENGLISH delivered the opinion of the court.

Plaintiff's complaint in equity sought damages for breach of contract and for the declaration and satisfaction of a lien on machinery and other property belonging to defendant. Defendant and Hexarmour Company filed a counterclaim for damages arising from the same contract, and for conversion of their property. A decree was entered in favor of plaintiff on both complaint and counterclaim, and defendant has appealed.

As we see this case, almost all the differences between the parties stem from their opposing views as to what constituted the basic contract. The master and the chancellor found in favor of plaintiff's contention that the terms of the contract were contained in an exchange of four letters—two from each party—written between July 2 and July 14, 1954. Defendant, on the other hand, argues that the source of contract rights is limited to the last three of these letters, and that plaintiff's letter of July 2 should play no part in the case, the proposals contained therein having been rejected by defendant.

At the time, defendant was in Florida, and Mr. V. A. Weiland, president and treasurer of plaintiff (whose name will be used interchangeably with that of plaintiff), was in Chicago. They had met only once, and then in Chicago on June 29, 1954, after a letter from plaintiff to defendant soliciting business. To that meeting, held at plaintiff's factory, defendant had brought a sample of Hexteel, a hexagonal patterned steel mat with squared ends, used in reinforced concrete. They discussed the manufacture of a somewhat similar product called Hexarmour. Certain machinery and steel belonging to defendant, which the parties contemplated would be used in the manufacture of Hexarmour, were then located at the plant

74

of Carlson Steel Products Company in Batavia, Illinois.

The pertinent parts of the four letters follow:

*Letter of July 2, 1954 from Weiland to Whitney*

Last Wednesday Mr. Bedner,* our Mr. Haydock and the writer visited the Carlson Steel Products Plant at Batavia to inspect your machinery and steel. Mr. Carlson was quite cooperative and appeared willing to help in any reasonable way to expedite this matter and get things rolling. He requested that the steel be removed by July 15th but after some persuasion by the three of us was willing to have us start by that time and complete the removal by July 30th. He claims that a carload of other steel is coming in about that time.

We likewise discussed with Mr. Bedner the possibility of securing his services as a Working Supervisor to oversee the skidding of the steel, shipping of machinery, setting up same in our plant and then to have under him a crew of approximately five men or whatever workers are needed, plus such additional skilled help as may be required to then turn out the mats in required quantities. From discussions with him we are led to believe that production in quantity should start in about six weeks. Mr. Bedner appears to be a capable individual who we believe will supervise and run the job to both your satisfaction and ours.

Our proposal will then appear as follows. Weiland will fabricate mats as required by you, using your special hydraulic clinching unit and your Rockford Press, Also your dies. Should additional

---

\* Adolph Bedner, who was employed in Chicago by Emerson Whitney Steel Products from January, 1953 until June 23, 1954.

punch presses be required we will also furnish same, one equipped with automatic roll feed. If necessary additional presses will also be furnished but the roll feed would have to be furnished and installed by you or by us at a price that we can agree upon if such volume materializes. You are also to furnish and install a roll feed on your present Rockford Press. We are informed that roll feeds at present require about ninety days delivery, so to get started we would use our press or transfer one of our present roll feeds to your press. Once installed and producing parts to your satisfaction, we will then maintain, repair and keep up all equipment due to normal wear and tear, but not repair or replace broken parts nor replace the entire unit or units when worn out. You, at your own expense, will move the machinery and steel from Batavia to our plant and set up same for production, including electrical wiring. We are locating your heavy motors very close to our master electrical panel board so that this should be a nominal expense. If you wish to hire your own labor for this purpose it is acceptable to us. However, if you care to have us furnish this labor we shall be glad to do so at actual costs plus 19% which is our out-of-pocket cash expense for payroll taxes, insurance, hospitalization and other fringe benefits. This could be done under Mr. Bedner's supervision who could approve daily time tickets, work done, etc. Reimbursement to us for this portion of the work would be on a weekly basis, due each week as the work progresses. Apparently some work has to be done on your die, to which we would assign our skilled toolmakers again under Mr. Bedner's instructions. In short, we would turn the job over to Mr. Bedner furnishing him such help as he may require.

We have approached the cost of our operations from four different angles, and always wind up somewheres between twenty-one cents and twenty-four cents per square foot. In doing so, we are taking Mr. Bedner's statements as to assembly speed etc. but which seems to us to be fair and accurate also. Likewise using your opinion that ten or eleven cents per square foot was direct labor cost and comparing it with increases since your time of manufacture again brings us to these figures. Therefore we could come to terms by quoting a cost plus basis using twenty cents as a floor and twenty-four cents as a ceiling. Or if acceptable to you we could go along on a flat twenty-two cent price until more experience can be gained, at which time we could then renegotiate the price to the satisfaction of all concerned. Mr. Carlson did not say so in so many words but we believe his expressions indicated that his twenty cent contract was on the low side and that he could operate his plant much more favorably in other orders.

If necessary the writer will be glad to fly to Florida to further discuss this program with you, should there be anything herein which could not be settled by telephone Tuesday afternoon when he will be back from Michigan. Our negotiations with Mr. Bedner have covered everything noted in this letter except price and we seem to be in quite harmonious accord. He did not, however, nor did we, mention anything about price. If acceptable to you, Mr. Bedner is willing to start immediately and we can likewise assign to him one or several men that he may require.

We have not had the opportunity to check credit angle on this matter which good business practice might require, but from our impressions and your

statements we assume that sufficient financial reliability is present by both you and us, which can be proved by proper investigation and background. We understand from your statement that you would accept billing for fabricated stock at time of shipment, but no date of payment was stated. We believe, however, this can satisfactorily be worked out.

It is also understood that you are to furnish all steel for this product and that we are to store same. We again assume that this can be done in quantities to suit your proper purchasing and our storage facilities, which would probably run to sixty or ninety days supply.

*Letter of July 9, 1954 from Whitney to Weiland*

Thank you for your letter of July 2nd, which as you know I received only yesterday. Thank you also for your very welcome telephone call.

I am quite willing to pay 22¢ sq. ft. for making the hexarmor which represents a price of 2¢ higher than that which three other companies have offered to charge. However, there were a number of items mentioned in your letter, which properly should and will have to be done by your good company in order to install and start production of hexarmor.

First of all it will be necessary for your company to load machinery and steel at Carlson's place and to unload it, and put the machinery together and install it in your plant. I shall pay the actual freight or cartage charges on both the steel, machinery and the dies and the fixtures, and any other items that were sent by me to Carlson Steel Products Company.

I value these items and inventory at over $50,000 and this is my capital investment in this matter plus any additional money I have to pay for the freight.

Secondly, each of my would-be subcontractors has offered to furnish an automatic feed of some sort to go with the Rockford Press, and I would have to ask you to furnish such a feed.

I shall take the burden of furnishing the additional presses and of purchasing the additional dies if the volume of business warrants, or if it is more convenient to you and more economical, I should be happy to make arrangements to pay a higher price for such hexarmor as we may find it necessary to make.

With the additional dies and presses furnished by yourselves, these higher prices could be invoiced as rent for your presses and as an installment purchase on the dies. You of course will be asked to maintain repair and keep up all tools, dies and other equipment, and to sharpen and replace punches as required, and to return all the tools, dies, machinery and equipment to me upon demand when our work is completed, in the same condition as when turned over to you, less normal wear.

I understand that the hexarmor die is now properly broken in and makes a good sample piece of hexarmor, with the possible exception of repositioning of the gauges. However, I am not a tool and die man, and I cannot guarantee that this is so, I can only tell you that the last sample pieces run off by Carlson looked fine to me. You will have to examine the die and if any adjustments are necessary on it, I will expect you to

make them as you will have to continue making them through out the time that the die is used. Any die that is run continuously with automatic feed, is subject to adjustments from time to time. I believe that an additional set of inserts and punches has already been made for us, but Mr. Bedner will have to verify it from the receipted bills of lading in his possession.

I note in your letter, that if any work has to be done on the die, you will turn it over to one of your die makers under Mr. Bedner's instructions. Mr. Bedner is an excellent worker and a good foreman, but he is not a tool and die maker. I gave a completed sample of the hexarmor as well as the blue prints of the finished produce and of the completed hexarmor clinching table to Carlson, and you should regain it then from him.

The most important thing is that the die and the clinching table will be able to make the hexarmor in accordance with the sample.

You are correct in the understanding that we ought to furnish all steel for this product, and you ought to store it in such manner that it does not become unsaleable as hexarmor by reason of excessive rust.

We of course undertake the burden of making and paying for the catalogues, advertising and the sales force, and we undertake all expenses in connection with the sale of this article. We also will agree to turn over to you for fabrication 100% of all orders received for hexarmor for the period of eighteen months from the date of the making an agreement, between ourselves, which agreement will be renewable for year to year thereafter, if neither party notifies the other of desire to continue such a contract within 60 days

of the termination of the original contract at any renewable date.

I think it should also be understood that you will be willing to run two or even three shifts in hexarmor department, before putting me to the additional expenses of purchasing additional presses and dies. At the previous plant where I made similar material, we ran four presses and two hexarmor clinching tables three shifts a day, six days a week and we still did not keep up with our orders.

You must band hexarmor with steel strapping and load it for shipment to my customers F. O. B. your plant.

We bill for hexarmor at 1% ten days net 30; I understand that your billings are ½% ten days net 30, and shall be willing to have you bill us when you ship the hexarmor to the orders at ½% ten days net 30.

You will note that there are a few dies and fixtures at Carlson Steel Product Company, which dies and fixtures are related in noway to hexarmor, but instead are for the making of open steel bridge docking. It is understood that you will also load and accept and store these bridge docking dies and fixtures at your factory on Avondale Avenue in Chicago at no extra expenses to us.

*Letter of July 14, 1954 from Weiland to Whitney*

Reference is made to your letter of July 9, 1954 and our telephone conversation regarding same. The terms of your letter are acceptable to us and are hereby accepted subject to the amendment that we agreed upon during our telephone conversation, as follows:

81

Weiland and Whitney will split the cost of moving the Rockford Press and the clinching machine from Batavia to Chicago on a 50–50 basis, such costs to include loading at Batavia, trucking to Chicago and unloading at Weiland's plant.

We have just received word that this can be done for $250, which seems a fair price to us and we are proceeding on this basis. Trucking is scheduled for Friday, July 16.

Now that everything is in order we are proceeding to go ahead with the job. The first load of steel will be in Thursday or Friday also, probably Thursday. Mr. Bedner has one load of steel and numerous small parts of the machines all set to go but Mr. Carlson refuses to release them until he gets a telegram from you authorizing him to release it. Will you kindly forward such a telegram immediately, if you have not already done so, since the trucker will be there early Thursday morning to start loading. Mr. Carlson is putting forth considerable pressure to get the steel and machinery out of his place, claiming that a carload of steel is on its way in and he must have the room.

A roll feed for your Rockford press will require about 60 to 90 days delivery. We will therefore fit your die to one of our presses already equipped, if possible, and use it until the Rockford is ready to go. We looked the die over and initial inspection indicates that only one of the four stations is in working order. We are immediately proceeding to complete it so that all stations can be used. No doubt you are quite willing to assume that this roll feed will under all circumstances be our property on your press for operational pur-

poses only. If this is not your understanding please advise at once.

We likewise believe it advisable to run two or three shifts, or two shifts overtime before requesting additional presses or clinching machines. We believe we can always work in harmony and unison on this entire program to the mutual advantage of both of us. As we discussed however we anticipate much more than 18 months production, assuming that our relations are mutually satisfactory, since to recover the initial expenses that we are undertaking and which were not included in our original quotation will require a goodly portion of the first 18 months run. We sincerely hope that this will turn out to be a life long contract and will do all we can to make it so.

The bridge docking job also appears to be very desirable and we shall be glad to discuss it further with you at your convenience. I should like to see you in Florida but first want to get this hexarmor program rolling and then consider the trip. I will call you or advise next week.

*Letter of July 14, 1954 from Whitney to Weiland*

Confirming our telephone conversation of yesterday, it is our understanding that my letter of July 9, to you states the agreement between your company and Hexarmor Company, which is my sales organization for hexarmor, with the following exceptions: . . .

[Here Whitney listed a breakdown of loading, trucking and unloading expenses which varied slightly from the proposal in regard thereto contained in Weiland's letter of July 14, but they were in essential agreement, the amount ($250) is of little consequence, and has not been made

83

an item of dispute in the litigation. Weiland testified: "I never disavowed Whitney's letter of July 14 or disagreed with it."]

In accordance with the foregoing, I have today telephoned the following telegram to Carlson Steel Products, on North Water Street, in Batavia, Illinois: "Please release to Weiland Tool and Manufacturing Company, of Chicago, all tools, dies, jigs, fixtures, presses, burners, reels, steel, and any and all equipment and supplies previously sent you by Emerson Whitney Steel Products and Hexarmor Company. Bedner now is employed by Weiland."

Weiland went to the Carlson plant, inspected Whitney's machinery, equipment and steel,* accepted delivery of it at the Weiland plant and undertook to set it up for production of Hexarmour. Difficulties were encountered, as certain repairs, adjustments and modifications were found to be necessary if production were to be achieved. In letters to Whitney later in July, informing him of this overhaul work, Weiland made no request for payment, however, and stated that work was progressing on schedule and that production was expected to begin in a week.

In a letter of August 24, 1954, Weiland reported to Whitney that everything was progressing very well and that "it now appears that Hexarmour will be rolling off the machine not later than September 1st." As a matter of fact, however, no Hexarmour mats meeting specifications were ever produced by plaintiff, and in 1956 the production line was dismantled.

---

* Weiland had made an inspection visit to the Carlson plant prior to writing his letter of July 2 to Whitney. On July 14 he went to the Carlson plant again. This visit was made before Weiland wrote his letter of that date to Whitney, and prior to his making final arrangements for shipment of the machinery, equipment and steel to his own plant.

Whereupon, plaintiff stored the machinery and steel in the open air where it rusted and disintegrated, and plaintiff refused to return them to defendant on the latter's demand.

The record in this case covers thousands of pages and we shall not attempt to recite the facts except in their barest outline. The underlying issue between the parties is not one of fact, but of law, and relates chiefly to the question of which party had the responsibility (financial and otherwise) for setting up the machinery, including the making of such modifications and additions as might be necessary, to produce Hexarmour in quantity sufficient to fill defendant's orders. The trial court found that the terms of the contract required defendant to furnish plaintiff with machinery capable of producing Hexarmour in quantity, and this, we believe, is an erroneous interpretation of the contract.

In reaching its conclusion on this issue, the trial court apparently relied on plaintiff's letter of July 2, but we conclude that the letter of July 2 is not to be considered at all, since its proposals were rejected out of hand by defendant's letter of July 9. The trial court also apparently relied, in part, on hundreds of pages of testimony concerning conversations between the parties, although the specific findings of the decree were that the terms of the contract were embodied in the four letters above set forth, and there was no finding of any ambiguity therein. We believe that practically all of plaintiff's evidence concerning conversations was inadmissible as an improper attempt to vary or contradict the terms of an unambiguous written contract. (Abingdon Bank & Trust Co. v. Bulkeley, 390 Ill 582, 591, 62 NE2d 447; Lewis v. Real Estate Corp., 6 Ill App2d 240, 248, 127 NE2d 272; Chicago Land Clearance Commission v. Jones, 13 Ill App2d 554, 142 NE2d 800; Belanger v. Seay & Thomas, Inc., 28 Ill App2d 266, 270, 171

NE2d 418; Globe Brewing Co. v. Simon, 132 Ill App 198.)

■ Certainly, Whitney's letter of July 9 did not constitute an acceptance of the July 2 letter. It was a counter-offer * on very different terms, indeed, and, in consequence, as of July 9 there was no contract at all between the parties. (Snow v. Schulman, 352 Ill 63, 71, 185 NE 262; Valdez v. Viking Athletic Ass'n, 349 Ill App 376, 379, 110 NE2d 680.)

■ Then, when Weiland wrote to Whitney on July 14, he accepted the offer of July 9, specifically stating that "the terms of your letter are acceptable to us and are hereby accepted." We therefore conclude, as did the chancellor, that there was a written contract between the parties. We believe, however, that its terms were set forth not in the four letters, but only in the last three of the letters, particularly Whitney's letter of July 9, and that Weiland's letter of July 2, having been rejected, became inoperative, and was not a part of the agreement at all. (I Corbin on Contracts, § 89.)

Yet, it is only in Weiland's letter of July 2 that we find any expression indicating that Whitney was to be responsible for the cost of putting the machinery into production. In that letter Weiland proposed that "You (Whitney), at your own expense, will move the machinery and steel from Batavia to our plant, and set up same for production." And, further, that if Whitney preferred to have Weiland do the work, then "Reimbursement to us for this portion of the work would be on a weekly basis."

These propositions were declared unacceptable by Whitney, and find no counterparts in his letter of July 9. Nor do plaintiff's later actions indicate that it was looking to Whitney for responsibility in setting

---

* In Weiland's testimony he, himself, characterized Whitney's letter of July 9 as a "counter-offer."

up production. That is, not until the denouement of the whole sorry affair and the later commencement of this action.

After Weiland received Whitney's letter of July 9, he gave no indication that he was holding out for the expense commitments from Whitney which we have referred to, above, in his letter of July 2. Quite the contrary. Except for a minor matter, of no present importance Weiland said in his reply dated July 14: "The terms of your letter are acceptable to us and are hereby accepted."

More than that should not be needed to demonstrate that Whitney's letter of July 9, and not Weiland's letter of July 2, expressed the agreement of the parties. But there is more.

By the time of Weiland's letter of July 14, he had made two inspections of Whitney's machinery and equipment at Carlson's plant. And he knew that it was not in condition to produce because he said in his letter of July 14: "We looked the die over and initial inspection indicates that only one of four stations is in working order. We are immediately proceeding to complete it so that all stations can be used."

That this was not work for which Weiland expected to be reimbursed (contrary to the original proposals in his letter of July 2), is fully established by a subsequent sentence in Weiland's same letter of July 14. He said: "As we discussed however we anticipate much more than 18 months production, assuming that our relations are mutually satisfactory, *since to recover the initial expenses that we are undertaking and which were not included in our original quotation will require a goodly portion of the first 18 months run."* (Emphasis supplied.)

This statement makes it perfectly clear that Weiland did not consider that Whitney had agreed to

Weiland's original proposals concerning initial expenses because here he is stating, in the very letter by which he expressly accepts Whitney's counter-proposals, that the transfer to Weiland of these initial expenses will consume his profit for "a goodly portion" of the entire period of the contract. The expenses he refers to must, therefore, have been known to him by that time to be a substantial item, and he mentions further that these are expenses "not included in our original quotation." In our opinion, this language could refer to nothing else but the matter which is at the very foundation of this entire dispute, and indicates conclusively that when Weiland wrote this letter he expressly abandoned his earlier proposals in this regard.

The principal bases in the decree for concluding that the equities favored plaintiff are the findings that Whitney breached the contract "in that he delivered or caused to be delivered to Weiland machinery which had never produced Hexarmour in quantity," *

* The master's report and the decree both contain a finding that the Whitney machinery had only produced hexarmour on a "by hand" basis. We cannot understand this finding in view of the very considerable testimony of witnesses who had seen it producing samples under power. There was enough of this evidence to prompt the master to say at that time: "I will give you a finding that it (the clinching machine) was in operation."

It should be borne in mind in this regard that Whitney's letter had not stated that the machinery had "produced hexarmour in quantity," but only that it had made "sample pieces," and even that capability he declined to guarantee.

A photograph was admitted in evidence as showing a sample of Hexarmour mat with square ends, manufactured on Whitney's machinery by Emerson Whitney Steel Products Co. prior to the time when the machinery was turned over to Carlson.

Also of interest on this point is another statement made by the master during Weiland's testimony about his inspection of the machinery at the Carlson plant. The master said to Whitney: "I will give you a finding now that you did not hide anything out there."

and that Whitney had "contracted to pay, at very reduced rates, for any labor and materials necessary to put the Whitney machinery into actual production." For these findings to be sustained we consider it essential, as a matter of law, that they find support in the contract as expressed in Whitney's letter of July 9. Examination of that letter discloses, however, not only the absence of supporting provisions creating such obligations on the part of Whitney, but also the presence of language which negatives any such conclusions.

We refer to Whitney's statements that, while the square foot price was satisfactory, there were a number of items which would have to be taken care of by Weiland in order to install and start production of hexarmour; that Whitney understood that the die "is now properly broken in and makes a good sample piece of hexarmour," but that "I am not a tool and die man, and I cannot guarantee that this is so, . . . . You will have to examine the die and if any adjustments are necessary on it, I will expect you to make them." *

█ Plaintiff urges us to read the July 9 letter as importing a warranty on Whitney's part that his machinery "was in condition where production could be had on it without alteration or major improvement," relying for authorities on Economy Fuse & Mfg. Co. v. Raymond Concrete Pile Co., 111 F2d 875, and MacAndrews & Forbes Co. v. Mechanical Mfg. Co., 367 Ill 288, 11 NE2d 382. From neither the language of the agreement itself nor from the circumstances surrounding it can we find that any such

---

* That Whitney did not expect such work to be done by plaintiff at Whitney's expense is, we believe, indicated not only by the general tone of his letter, but also by his statement to the effect that his capital investment in the venture was represented by the value of his machinery and steel plus only the item of freight for moving them to plaintiff's plant.

89

warranty existed. On the contrary, we conclude that defendant had acted reasonably to make it clear that he was refusing to warrant the production capabilities of his machinery.

We may note also that by reason of Whitney's caveat to Weiland that he could not guarantee the die, and that Weiland would have to examine it himself (which he did), Weiland cannot equitably be heard to say that he relied on any warranty by Whitney if one were to be imported. On the contrary, this language may be said to have the effect of requiring plaintiff to pay appropriate attention to the matter of the productivity of the equipment. (Vargas v. Esquire, Inc., 166 F2d 651; cert den, 335 US 813; Bundesen v. Lewis, 368 Ill 623, 632, 15 NE2d 520; Malnick v. Rosenthal, 313 Ill App 249, 39 NE2d 767.)

■ In fact, the language used by Whitney evidences, in our opinion, that the machinery was being furnished on an "as is" basis. To be sure, those words were not employed, but the sense of his letter, nevertheless, was that Weiland was to take the machinery upon express condition that he must trust to his own examination. And from this flows the legal corollary that such a condition negatives both express and implied warranties. (Garofalo Co., Inc. v. St. Mary's Packing Co., 339 Ill App 412, 90 NE2d 292; 1959 Ill L Forum 1071.)

■ On somewhat the same subject, the decree found that "Whitney was the moving party in bringing about the breach and the impasse between the parties and the making of this an unsuccessful business venture by misleading 'big talk' and unwarranted statements and 'puffing' of and about his machinery . . . ." It has long been the law that exaggerated or unwarranted "puffing," or other expressions of opinion, are not sufficient to enable a party to avoid the consequences of his contract. (Zalapi v. Holcomb

& Hoke Mfg. Co., 241 Ill App 102, 106; Fuchs & Lang Mfg. Co. v. R. J. Kittredge & Co., 242 Ill 88, 95, 89 NE 723; Brady v. Cole, 164 Ill 116, 120, 45 NE 438; Burwash v. Ballou, 230 Ill 34, 38, 82 NE 355.)

■ It may be that plaintiff entered into the contract improvidently, but it is not the province of a court of chancery to "construe into a contract provisions which are not there" even though "a more equitable result might be reached thereby." (Abingdon Bank & Trust Co. v. Bulkeley, 390 Ill 582, 62 NE2d 447.) Contracting parties must be left free to employ in the market place whatever they may possess of wisdom or folly, and are bound by the plain and unambiguous terms of whatever agreements they may reach; absent, of course, fraudulent overreaching, concerning which there are no allegations in this case. (Green v. Ashland Sixty-Third State Bank, 346 Ill 174, 178 NE 468.)

■ Another basic breach of the contract was found to have been committed by Whitney in his failure to use his best efforts in promoting the sale of hexarmour by advertising or otherwise. We agree with the chancellor's interpretation that the contract called for Whitney diligently to devote a "reasonable amount of time to the venture." (Economy Fuse & Mfg. Co. v. Raymond Concrete Pile Co., 111 F2d 875, 878; Parker v. Platt, 74 Ill 430.) This obligation must be measured, however, against the situation existing during the months following the making of the contract.

It is undisputed that Weiland never did manufacture the product contemplated by the parties. There was nothing to sell; not even any samples from which sales might be made. Plaintiff concedes and the evidence discloses that Whitney did make extensive sales efforts; that he did circulate letters among industries

91

with possible interest in the product,* and did commence to make arrangements for agents in various parts of the country. In general, he kept himself in a position to perform his part of the contract, but it would have been absurd under the circumstances for him to have produced a large volume of orders which could not be filled. To have done so would certainly have burdened himself with unsatisfied customers and perhaps lawsuits as well.

In the light of this factual outline, we believe that Whitney did not breach the contract by failing to do more sales work then he did. This conclusion, moreover, is buttressed by our views on plaintiff's breach of the contract in failing to make the specified product and in demanding that defendant assume the expenses of putting the machinery into production. If defendant needed an excuse for not making further sales, plaintiff furnished it by its own breach of the contract. (Eager v. Berke, 11 Ill2d 50, 54, 142 NE2d 36; Hinckley v. Pittsburgh Bessemer Steel Co., 121 US 264, 274; Consumers Mut. Oil Co. v. Western Petroleum Co., 216 Ill App 382, 385.)

■■■ On the strength of the chancellor's interpretation of the contract, he directed Whitney to pay Weiland $12,661.62 for labor, material and profit "for, assembling and improving the Whitney machinery." ** For the reasons we have indicated, we consider this to have been Weiland's own obligation, and the decree, therefore, to be erroneous in this regard.

The decree also awards to plaintiff $475.20 for 72 completed mats of hexarmour computed at the contract price of 22 cents per square foot. This, too, we believe to be in error, because it is conceded that

---

* In evidence is an order of Gulf Oil Corporation dated October 20, 1956 for a carload of hexarmour. This order was rejected by Weiland who had, by then, dismantled the production line.

** Curiously, the decree also found "unnecessarily extensive disassembling of the Whitney machinery by Weiland."

these mats had ragged instead of squared ends"; *
were not interchangeable with the competing product,
Hexteel; and were, therefore, not made in accordance
with the specifications of the contract to make ac-
cording to sample.** We refer to the same of Hexteel
which had been furnished to Weiland, and to the
statement in Whitney's letter of July 9 in which he
said: "The most important thing is that the die and
the clinching table will be able to make hexarmour in
accordance with the sample."

██ Furthermore, plaintiff's complaint does not
seek payment for the 72 mats. So, even if there were
evidence to support such a claim, the failure to plead
the issue would be fatal. (Consoer, Townsend & As-
sociates v. Addis, 37 Ill App2d 105, 110, 185 NE2d 97;
Burke v. Burke 12 Ill2d 483, 487, 147 NE2d 373.)

The decree provided further that plaintiff was en-
titled to retain possession of defendant's machinery
and steel, against defendant's demand for the return
thereof, by virtue of a lien securing the full payment
of the amounts found to be due. Included in the
amounts so found due is an indeterminate sum of
$100 per month for storage, commencing November
1, 1954 and continuing until the decree is fully satis-
fied.

██ It would seem to us that a storage charge
is inconsistent with a lien. (Johnson v. Throop
Street Auto & Wagon Co., 232 Ill App 513, 515.)

As to defendant's steel and equipment not related
to hexarmour, the contract expressly negatived the

---

* The decree found that mats with the ragged endings were
unsalable.

** Weiland testified that at his June 29, 1954 meeting with
Whitney all the samples which he saw had Hexteel (squared)
endings.

Bedner testified that at this meeting Whitney showed Weiland
the sample of Hexteel and said, "This is how it should look."

imposition of any storage charges,* and as to the hexarmour equipment it is our opinion that the tenor of the entire contract impliedly negatived any charge for storage.

In any event, we find that there is no debt due from defendant to plaintiff, and, certainly, in the absence of a debt there can be no lien. (Watson v. Hobson, 401 Ill 191, 201, 81 NE2d 885; Slusarz v. Slusarz, 18 Ill App2d 25, 35, 151 NE2d 411.)

For the reasons indicated the decree is reversed, and the cause is remanded for disposition of the counterclaim in accordance with the views expressed in this opinion.

■■ The fees of the master were fixed by the chancellor and assessed as costs. The costs were assessed 90% against defendant and 10% against plaintiff. Consistent with the conclusion we have reached, this cannot stand, and the costs should equitably be assessed against plaintiff.

Our disposition of defendant's appeal also disposes of plaintiff's cross-appeal seeking a higher award of damages than that allowed by the trial court.

Reversed and remanded.

---

* Whitney's letter of July 9 includes the following:

You are correct in the understanding that we ought to furnish all steel for this product, and you ought to store it in such manner that it does not become unsaleable as hexarmor by reason of excessive rust.

. . . . . .

You will note that there are a few dies and fixtures at Carlson Steel Product Company, which dies and fixtures are related in noway to hexarmor, but instead are for the making of open steel bridge docking. It is understood that you will also load and accept and store these bridge docking dies and fixtures at your factory on Avondale Avenue in Chicago at no extra expenses to us.

MURPHY, J., concurs.

BURMAN, P. J., dissenting:

The majority, in reversing the findings of the Master and the Decree of the Chancellor, do so on the sole basis that the issues were of law and not of fact. The majority opinion thus avoids determining this appeal on the manifest weight rule. I cannot agree with this narrow conception. Rather, I believe this appeal does present questions of fact and that there is substantial evidence to support the Decree and findings. However, even if I were to agree with the majority that the contract is embodied in the letters of July 9th and 14th, I would still feel that the judgment below should be affirmed.

The Master found the issues generally for the plaintiff and allowed plaintiff $12,661.62 as costs for alterations and additions made on defendant's equipment, together with $475 for the completion of 72 mats of Hexarmour at the contract price, and storage charges in the amount of $100 per month for a certain period. Plaintiff's additional claim for $40,000 for the interruption of an established business was disallowed. Defendant appealed and plaintiff cross-appealed.

This controversy does not involve a formal contract, executed by both parties and embodying all of each party's rights under one document. The written memoranda, the four letters set forth in the majority opinion, do not, in themselves, clearly define each party's rights, understandings and liabilities under the contract. On the contrary, in order to arrive at the true understanding of the parties, it was necessary and proper, in my opinion, for Master James Leaton to admit such evidence of the surrounding circumstances as would aid him and the court in arriving at the true meaning of the parties. I do not believe the

95

rule against the admission of parol evidence has any applicability in the instant case.

To better understand this controversy it is necessary to examine the actions of the parties both prior and subsequent to the exchange of letters. It is undisputed that Weiland had not previously made either Hexsteel or Hexarmour and that Whitney was seeking someone to manufacture Hexarmour on his, Whitney's, machinery and equipment. Weiland was introduced to Whitney by Adolph Bedner, who had been in the employ of Whitney during the previous year.

Bedner testified that he became familiar with Hexarmour during his employment with Whitney and that upon the termination of this employment, Whitney told him he would give him a commission if he, Bedner, found someone to manufacture Hexarmour. Bedner said he visited many tool and die factories on the Northwest side of Chicago for that purpose and to get himself a job and that is how he located Weiland. After the initial contact, he telephoned Whitney. The following day, about July 1, 1954, Whitney and Bedner went to Weiland's plant. This was Weiland's first meeting with Whitney and Bedner testified that Whitney did most of the talking, explaining how the Hexarmour machinery would be set up, how he would be able to get orders that would keep Weiland's plant busy day and night, using three shifts.

Whitney, who is an attorney, testified pro se. He said that he gave up practicing law in 1952 and that upon leaving the Klemp Company, he set up his own plant in Chicago until a fire caused him to discontinue business. He said he then placed advertisements in the newspapers for someone to manufacture "a steel article." In the meantime, he made arrangements with one Carl Carlson to manufacture Hexarmour at Carlson's plant, but after a short time Carlson abandoned the project. It was then that Whitney told Bedner to see about the possibility of finding another manufacturer. Whitney said he gave Bedner the names

96

of firms that had responded to the newspaper advertisement. Whitney stated that when he visited Weiland's plant he had with him several sample pieces of Hexarmour as well as several stainless steel samples of Hexsteel. He also had several catalogs relating to Hexsteel. Whitney said he explained to Weiland that the Hexarmour product was to be the same as Hexsteel except that two little round holes would be eliminated.

In answer to Weiland's questions as to why Whitney was not manufacturing Hexarmour himself, Whitney said he told Weiland that he had had to close his plant because he was temporarily short of funds. He said he explained to Weiland that he had not lost any money on the Hexarmour program; that he had not gone into production, but "merely got the machinery set up and *made samples, enough to prove to ourselves that the dies would make Hexarmour.*" (Emphasis mine.)

Whitney then explained to Weiland his relationship with the Klemp Company. He said that in 1946 Klemp was doing about $300,000 worth of business, but that when he left in 1951, business had grown to over one and a quarter million dollars a year. He said profits rose from nothing to $153,000 a year, a good portion due to the Hexsteel program. Whitney further testified that he told Weiland that Weiland would have to examine the equipment himself because he, Whitney, was not a tool and die man. He said he explained that the strip die needed work; that parts of the clinching machine were strewn over a large area at Carlson's plant causing difficulty in locating the pieces; that Carlson claimed some piping was missing and he was probably right; and, that the clinching machine would have to be put together. Whitney said he told Weiland to go to Carlson's plant and look over the machinery. After this meeting Whitney left for Florida to sell some property and the correspondence set out in the majority opinion followed.

97

Weiland testified that he is the president and general manager of Weiland Tool & Die Company and that the business consists of using their know how "for the purpose of manufacturing custom made items as designed by our clients' engineers." He said he does not manufacture for sale at retail. He said Bedner and Whitney examined his plant after Bedner, who said he represented Whitney, made the appointment. At this meeting he was shown samples of both Hexarmour and Hexsteel and Whitney explained the details of how the products were manufactured on Whitney's machinery. Weiland testified that he was told that if he would manufacture Hexarmour Whitney would sell it in carload lots; that when he, Whitney, was with Klemp he brought in enough sales to keep them going three shifts a day, six days a week; that he had connections with the trade industry using the product so that he would be able to get orders for great quantities; and, that he had invested $50,000 in equipment and purchased 300,000 pounds of steel which was on Carlson's premises on the assurance he would be able to sell the product. He asked Weiland if there were enough help available to run two or three shifts. Whitney then told Weiland to go to Carlson's with Bedner to examine the equipment and that time was of the essence. Weiland was assured that although the machinery had been disassembled at Carlson's, all Weiland would have to do was put it together again, hook it up to electricity and he would be in production.

Weiland said he went to Carlson's with Bedner to examine the equipment and found it lying around loose. The motors were disconnected, the dies mixed up; practically everything was dismantled. Weiland said it was impossible, under those conditions, to determine if the machinery were operative and could produce Hexarmour and while everything looked all

right, he could not tell until he had the machinery assembled and running under power.

In the exchange of letters between July 2nd and July 14th neither party made an unqualified acceptance of the other's offer although both parties agree that a contract was reached by the exchange of letters. Whitney contends that the contract terms are limited to the letters of July 9th and July 14th. The majority accept this contention, stating that Whitney's letter of July 9th rejects out of hand the terms embodied in Weiland's letter of July 2nd. I cannot agree. Rather than being a rejection, the language used in the July 9th letter is actually consonant with the language used in the July 2nd letter and both letters should be considered in determining the contract terms. For example, the price of twenty-two cents per square foot, mentioned in the July 2nd letter, was accepted by Whitney in his July 9th letter. The evidence shows this price was reached on the basis that Weiland would produce the product with equipment and machinery provided by Whitney. The requirement that Whitney furnish all steel was likewise accepted. The matter of freight charges was not settled until the July 14th letters.

The major area of controversy, whether Whitney was to furnish machinery capable of producing Hexarmour or whether Weiland was responsible for putting the machinery in shape to manufacture, even if it required making major alterations and additions, was also settled by this correspondence. Weiland's letter stated that, "[o]nce installed and producing parts to your satisfaction, we will then maintain, repair and keep up all equipment due to normal wear and tear, but not repair or replace broken parts nor replace the entire unit or units when worn out." In his letter Whitney stated he would assume the burden of furnishing additional presses or be willing to pay

99

a price higher than the established twenty-two cents if Weiland furnished the additional dies and presses. Whitney's letter of July 9th states, "I can only tell you that the last sample pieces run off by Carlson looked fine to me. You will have to examine the die and if any *adjustments* are necessary on it, I will expect you to make them as you will have to continue making them throughout the time that the die is used. *Any die that is run continuously with automatic feed, is subject to adjustments from time to time.* I gave a *complete sample of the Hexarmour* as well as the blue prints . . . to Carlson . . . *The most important thing is that the die and the clinching table will be able to make the Hexarmour in accordance with the sample."* The letter further states, "[y]ou, of course, will be asked to maintain, repair and keep up all tools, dies and other equipment, and to sharpen and replace punches as required, and to return all the tools, dies, machinery and equipment to me upon demand when our work is completed, in the same condition as when turned over to you, less normal wear." Meaning cannot be given these words by treating Whitney's letter as an isolated piece of correspondence. It must be remembered that this was written in response to Weiland's letter which stated, "Weiland will fabricate mats as required by you, using your special hydraulic clinching unit and your Rockford Press, *also your dies* . . . to turn out the mats in required quantities." (All emphasis above mine.) I can only conclude that the letters support the proposition that Whitney was to furnish equipment capable of producing the product.

After the exchange of letters, Weiland put Bedner on his payroll and work commenced on the Hexarmour program. The machinery was moved to Weiland's plant and assembly was begun about July 24th. Some difficulties were immediately discovered and were

called to Whitney's attention in a letter of July 27th. Another progress report was sent July 29th along with an inquiry about orders. As further progress was made, more deficiencies in the equipment were discovered and on August 11th Weiland informed Whitney that strips would not come out in uniform lengths because the condition of the dies was such that the height of the hexagons varied, thereby preventing production of uniform 36 inch mats. Weiland reminded Whitney that the contract called for Weiland's manufacturing Hexarmour, but that Whitney had the responsibility of completing and correcting the machinery. On August 16th Weiland gave Whitney a written report describing some twenty-six errors, omissions and incompletions then known to him even though the clinching table had not been tried under power. Weiland listed the cost of repairs at $5,144.44. Weiland testified Whitney told him to fix the machinery and he, Whitney, would pay the cost. Another invoice of charges was sent August 24th and on August 28th Weiland showed Whitney that the action of the clinching machine was so jerky and irregular that he was afraid the machine would be ripped to pieces. On September 1st Whitney wrote Weiland agreeing to pay the assigned portion of the work on the clinching table, mentioning that, "these bills hit me at a hard time," and that changes, additions and improvements on the machines would belong to his company. On September 13th Weiland wrote Whitney advising him that expenses not covered in the August 24th invoice were an additional $4,800.

Weiland said he then visited the Klemp Company and discovered there was a difference in the Hexarmour and Hexsteel dies, the difference being in the way the cut off bar was made. On September 23rd Weiland wrote Whitney about the different methods of joining Hexarmour mats and pointed out the prob-

101

lem of die changes and additional costs. He suggested placing mats on the floor and assembling them for Whitney's inspection. On September 25th Weiland delivered samples to Whitney which Whitney approved and ordered into production. Between September 25th and October 3rd seventy-two mats were produced and although Weiland pressed Whitney for money and/or orders, he was unable to get either. Whitney told Weiland not to worry about orders as they would be forthcoming in large quantities. With regard to money Whitney told Weiland the government contracts he had had not come through as yet, but that Weiland should be patient and sit tight. Bedner testified that Whitney inspected the seventy-two mats and said they looked exactly the way they should look.

After October 6th work on the Hexarmour program came to a standstill and on October 8th Bedner was discharged. After a meeting on November 11th Weiland was unable to communicate with Whitney until May of 1955 when he received a letter from Whitney followed by a visit to Weiland's plant in July. In response to Weiland's question as to where he had been Whitney informed him that he had taken a job with a trade association and had been travelling a great deal. He again stated no orders had been acquired, but that he would get sales in great quantities soon. However, Whitney was able to produce only one order, that of October 20, 1956.

Weiland stated he had his plant in readiness for production from July of 1954 to January of 1955 and that the Hexarmour program occupied about 40% of his plant space. On July 22nd Whitney wrote Weiland informing him that he would pay Weiland $5,062.65 if Weiland would release the equipment, which offer Weiland refused. After further futile negotiations, this suit was instituted on October 18, 1956.

102

Whitney's letter of July 9th was not a complete rejection of Weiland's offer of July 2nd nor can it be construed, by any stretch of the imagination, as a complete understanding of the parties agreement. However, even if the July 9th letter is to be considered by itself, we must bear in mind that it was prepared by Whitney and any ambiguities in written instruments should always be construed most strongly against the author. Crerar Clinch Coal Co. v. Board of Education of Chicago, 13 Ill App2d 208, 141 NE2d 393; 12 ILP, Contracts, § 221. This is especially true in this instance since Whitney is an attorney.

In the July 9th letter Whitney wrote that Weiland was to make any "adjustments." Weiland, a tool and die man, testified that this term is understood by the trade to mean minor adjustments, not major alterations, improvements or furnishing of new parts. In construing the meaning of the terms of a written instrument, the court will, "interpret the instrument in view of the circumstances surrounding it at the time it was made, considering the objects and purposes the parties had in mind, so that the court may understand the language used in the sense intended by the parties using it." Furst v. Board of Education, 20 Ill App2d 205, 217, 155 NE2d 654. The July 9th letter can only be understood by considering the July 2nd letter and the other surrounding circumstances. This the Master did. I agree with the majority that it is not the province of the court to renegotiate the parties' contract. However, by holding Weiland responsible for undertakings he did not consent to, that is, in effect, what the majority does. To hold that the language of the July 9th letter makes Weiland responsible for all adjustments, alterations and improvements necessary to put the equipment in condition to manufacture Hexarmour would make the contract impossible of profit for Weiland. As the

103

court said in Ouska v. Pearson, 291 Ill App 6, 10, 9 NE2d 69:

> Considering the document, then, as a whole, and not as expressing an agreement in any single provision or word, we hold that the contract, literally construed, would be unusual, inequitable, and such as reasonable men would not likely enter into . . . The document cries for an explanation.

When, in his letter, Whitney states, "I cannot guaranty . . . I am not a tool and die man . . ." We must remember that Whitney was something more than just a layman in this field. He was the man who explained all the intricate details of the Hexarmour program to Weiland, using catalogs, samples and blue prints. The letter itself contains language illustrating that Whitney was familiar with tool and die work for he cautioned Weiland, "[a]ny die that is run continuously with automatic feed, is subject to *adjustments* from time to time." It is only when the July 9th letter is read in light of the surrounding circumstances that the real meaning of the language used can be determined.

The majority place great weight on the portion of the letter stating that Hexarmour must be made "in accordance with the sample." The majority accept Whitney's contention that Weiland's mats, having end connections differing from those on Hexsteel,* did

---

* The ends of Hexsteel are closed hexagons with a protruding tongue. Strips are connected one to another by joining the tongues with a special tool. The Hexarmour mats produced by Weiland, which the majority describe as having "ragged ends," has open hexagon endings. That is, one end has four sides of an incomplete hexagon, the other, the other two sides. When joined, there would be a continuous strip of hexagons. The parties conflict over whether or not the Hexarmour mats produced by Weiland would be interchangeable with Hexsteel.

104

not meet the contract specifications. The exact language of the July 9th letter is:

> The most important thing is that the die and the clinching table *will be able* to make the hexarmour in accordance with the sample. (Emphasis mine.)

The majority treat this language as placing an obligation on Weiland. Weiland contends, correctly I believe, that this language is actually a guarantee on Whitney's part that Whitney's machinery and equipment would produce the desired product.

In MacAndrews & Forbes Co. v. Mechanical Mfg. Co., 367 Ill 288, 11 NE2d 382, the Supreme Court pointed out that no particular words are needed to create an express warranty, but that whether an express warranty exists is to be shown from the intent of the parties. The court stated that:

> The intention of the parties is to be determined from the language employed, when read in the light of the context of the instrument and such surrounding circumstances as will aid the court in arriving at the true meaning of the parties. 367 Ill at 297.

In MacAndrews, the plaintiff contracted with defendant for the purchase of a spray drying machine to use in the manufacture of licorice and brought suit for breach of warranty. Plaintiff had written defendant requesting information about the machine defendant would be able to furnish. Included in this letter was a request for the "[g]uaranteed evaporation in lbs. water per hour over a 24-hr. period." Defendant's reply offered to provide a machine designed for the evaporation of 100 gallons of liquid per hour, but made no mention of operation for a 24-hour period. Plaintiff accepted this offer. Subsequently, plaintiff

105

brought suit contending the machine would not operate for a 24-hour period. In determining that there was a warranty for 24-hour operation, the court considered other written memoranda of the parties as well as the surrounding circumstances. This is what the Master did below in the instant case and I do not believe it to have been error to do so.

I believe the other language in the July 9th letter, the other letters, the surrounding circumstances and the actual language used, "will be able," support Weiland's contention that Whitney made a guaranty. The evidence below is substantial that Whitney's machinery, as delivered to Weiland, would not produce mats with end connections any different than those produced by Weiland. Yet in his letter, Whitney states that the Hexarmour previously produced by his machinery, "looked fine to me." Further, there is the testimony of Bedner that in October of 1954 Whitney gave his acceptance to the mats produced by Weiland. Even if the language quoted above is construed as placing a burden on Weiland, there is substantial evidence that Weiland produced a product that met "specifications."

The majority also rely on the fact that Weiland was told to, and did, make inspections. However, this inspection was to be made of machinery strewn about another plant. Whitney knew this. That the machinery was incapable of making Hexarmour with end connections similar to Hexsteel was not ascertainable by Weiland through any visible examination. The majority assert, however, that although Whitney's letter of July 9th does not contain an "as is" clause, the "sense" of the letter makes this an "as is" contract. If Whitney, a lawyer, desired to draft an "as is" contract, he surely was capable of clearly stating it. As I stated previously, any ambiguities in the July 9th letter should be resolved in favor of Weiland. To construe the letter so that an "as is" clause is added

is to give Whitney every favorable intendment from language he alone chose to use.

The majority recognize that even though the contract did not specify a minimum amount of orders, Whitney was still obliged to use his best efforts to secure orders. However, even though Whitney did not secure a single order until October of 1956, even though he took another full time job with a trade association, and even though, during the early months of the contract, when major difficulties arose, he kept himself secluded from Weiland, the majority state that, in general, Whitney kept himself in a position to perform his part of the contract. The majority state that it would have been absurd under the circumstances for Whitney to have produced a large volume of orders. The facts are that Whitney produced no volume at all. If Weiland had an obligation to produce samples and made a breach by failing to do so, this was an inconsequential breach for there was no showing below that any orders were lost because samples were not available. Whether Whitney used reasonable efforts in performing his part of the contract is, I believe, a question of fact, and there is substantial evidence to support the finding below that Whitney did breach this part of the contract. Sampson v. Marra, 343 Ill App 245, 98 NE2d 523.

In conclusion, I believe Whitney's letter of July 9th is not the formal agreement of the parties. The Master did not err in considering Weiland's letter of July 2nd along with the other letters nor did he err in admitting parol evidence to explain the written language. The record is clear, I believe, that Whitney's equipment could not produce Hexarmour as warranted by Whitney. The Master and Chancellor awarded plaintiff damages solely on a quantum meruit basis. In my opinion, this was a fair and equitable award and I believe the Decree in question should be affirmed in all particulars.